[Cite as *Essman v. Portsmouth*, **2010-Ohio-4837.**]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

LARRY ESSMAN, et al.,                    :

    Plaintiffs-Appellees,            :    Case No.  09CA3325

    vs.                              :

CITY OF PORTSMOUTH,                      :    DECISION AND JUDGMENT ENTRY

    Defendant-Appellant.             :

_____

APPEARANCES:

COUNSEL FOR APPELLANT:     Lawrence E. Barbiere and Robert S. Hiller, 5300
                           Socialville-Foster Road, Suite 200, Mason, Ohio
                           45040

COUNSEL FOR APPELLEES:     D. Joe Griffith, 144 East Main Street, P.O. Box 667,
                           Lancaster, Ohio 43130
_____
CIVIL APPEAL FROM COMMON PLEAS COURT
DATE JOURNALIZED: 9-29-10

ABELE, J.

{¶ 1} This is an appeal from a Scioto County Common Pleas Court judgment

finding that the City of Portsmouth, defendant below and appellant herein, is not entitled

to statutory immunity under R.C. Chapter 2744.

{¶ 2} Appellant raises the following assignment of error for review:

> "THE TRIAL COURT ERRED IN DETERMINING
> PORTSMOUTH WAS NOT ENTITLED TO
> GOVERNMENTAL IMMUNITY PURSUANT TO CHAPTER
> 2744 OF THE REVISED CODE."

{¶ 3} This case involves the city's liability for flooding damage that appellees, a group of homeowners, suffered when the city's sewer system backed up onto their properties. Appellees' properties are connected to the Lawson Run trunk line, which is a combination storm water and sewage system. Lawson Run is the main trunk line and empties into a diversion chamber at the city's Waste Water Treatment Plant. The water is pumped from the diversion chamber into the treatment plant, where the water is treated before release into the Ohio River. The city can control the amount of water that flows into the diversion chamber by raising or lowering the "weir gates."

{¶ 4} The Ohio EPA regulates the city's treatment plant and restricts any discharge of untreated wastewater, known as a combined sewer overflow (CSO), into the Ohio River. The EPA authorizes a CSO "only during wet weather periods when the flow in the sewer system exceeds the capacity of the sewer system." The EPA requires the city to "[p]rovide for the maximum use of the collection system for storage of wet weather flow prior to allowing overflows. [The city] shall maximize the in-line storage capacity." The EPA further prohibits the city from bypassing or diverting wastewater from the treatment plant unless: "1. Bypass was unavoidable to prevent loss of life, personal injury, or severe property damage; 2. There were no feasible alternatives to the bypass, such as the use of auxiliary treatment facilities, retention of untreated wastes, or maintenance during normal periods of downtime. * * * *" The EPA requires the city to "take all reasonable steps to minimize or prevent any discharge in violation of this permit which has a reasonable likelihood of adversely affecting human health or the environment." In accordance with the EPA permit, the city attempts to operate the treatment plant so as to prevent untreated wastewater from flowing into the

Ohio River.   During wet weather events, the city uses the Lawson Run sewer system as storage for the wastewater.   This practice allegedly causes sewage to flood appellees' properties.

{¶ 5} On July 25, 2006, appellees re-filed a December 29, 2004 complaint against appellant based upon repeated sewage intrusions that they have experienced in their homes.   They alleged that their homes have flooded with raw sewage on "multiple occasions the past several years."   Appellees claimed that the flooding resulted from appellant's "over-burdened and poorly maintained sewer line facilities." Appellees' causes of action asserted that: (1) appellant negligently failed to maintain, repair, and upgrade its sewage line facilities, despite knowledge of the flooding problems; (2) appellant negligently operated the sewer system "by purposely causing an obstruction to be placed in the line through the closing of a gate which caused the system to back up, altering the hydraulic grade of the system and ultimately causing" appellees' properties to become flooded with sewage; (3) appellant's failure to properly maintain and/or repair the sewage lines constitutes a qualified nuisance; (4) appellant's negligence caused some appellees to be exposed to "dangerous and noxious chemicals and fumes"; (5) appellant's negligence caused some appellees to suffer property damage; and (6) appellant's negligence caused some appellees to suffer loss of consortium.   Appellees additionally alleged that the flooding of raw sewage on their premises constituted a taking of their properties and requested the court to order appellant to institute appropriation proceedings.   Appellees sought monetary damages, equitable relief to compel appellant to "repair/maintain/upgrade its sewage facilities and storm water drain runoff systems in order to prevent future harm," costs and attorneys

fees, and, in the alternative, an order of mandamus to compel appellant to appropriate appellees' properties and to pay them the fair market value of their respective properties.

{¶ 6} Appellant denied liability and further asserted that it is entitled to statutory immunity under R.C. Chapter 2744.

{¶ 7} Subsequently, appellant requested summary judgment and argued, inter alia, that it is statutorily immune from liability. Appellant asserted that appellees failed to establish that its activities regarding the sewer system are anything other than governmental. Appellant additionally contended that even if liability could be imposed under an R.C. 2744.02(B) exception to immunity, its decision regarding the operation of the sewer system involved the exercise of judgment and discretion, thus re-instating its immunity under R.C. 2744.03(A)(5).

{¶ 8} Appellees memorandum contra to appellant's summary judgment motion asserted that appellant has known since the early 1970s that sewage backflow flooding has existed in appellees' neighborhood, yet appellant "has not instituted a routine maintenance plan and the system continues to suffer from lack of maintenance which has exposed [appellees] to constant and persistent flooding." Appellees argued that appellant is not entitled to statutory immunity for its failure to maintain the sewers and to ensure that the sewer system is adequate to meet the city's needs. To support their claim that appellant negligently maintained the sewer system, appellees relied upon the affidavit of their expert, Vincent Ricca, who opined:

> "[T]he flooding via sanitary backflow for the event dates in
> [appellees'] complaint experienced by the [appellees] at their respective
> properties in Portsmouth, Ohio was caused by the negligent lack of sewer

system maintenance, which allowed storm water to enter the sanitary sewers causing the sewer system to become overloaded and overcharged, causing the sewer system to work improperly, causing sewage backflows into the properties of [appellees]. The inflows of storm water overloaded both the downstream and upstream sewer systems which produced a surcharging of the lines, causing sewage flooding into the residences of [appellees]. It is my opinion, based upon a reasonable degree of engineering certainty that had the City of Portsmouth conducted proper sewer maintenance on the sewer system in the area of [appellees'] properties, the flooding events would not have occurred at the times mentioned in [appellees'] complaint. It is further my opinion, based upon a reasonable degree of engineering certainty, that the city of Portsmouth was negligent in allowing additional development in an area where the sewer system was already overloaded without first taking steps to upgrade the sewer system to accept the additional sewage and storm water surcharge and was negligent by failing to have a maintenance plan."

**{¶ 9}** In his deposition, Ricca stated that the city's sewer system is not functioning properly and that to resolve the problem, the city needs to eliminate the old system. He believed that the city's failure to properly operate the Lawson Run trunk sewer caused the flooding. He explained that when the city expected to have a discharge into the Ohio River, the city closed the gate and held the storage back so that it could treat the storm and sewage water before releasing it into the river. In his opinion, he does not believe that the city should allow the system to become overloaded in an effort to prevent a CSO. He stated that to resolve the problem, the city should either open the weir gate (which would allow a CSO to occur) or build a new sewer. He opined that if the city would allow the wastewater to flow into the Ohio River untreated, the chance of appellees' properties flooding is "greatly reduced." Ricca could not, however, state within a reasonable degree of certainty whether the raising of the weir gate caused appellees' flooding or whether the flooding was due to an overload of the system from significant rain events. Ricca further opined that appellant was

negligent for allowing additional development to "hook[] into a system that already was giving them problems for many years." He stated, in essence, that appellant's sewer system is inadequate to handle the flow of water in the system. Ricca also stated that appellant did not appear to have any defined procedure regarding the opening or closing of the weir gates during wet weather periods and apparently left the decision to the plant operator's judgment.

{¶ 10} William E. Norris prepared the city's Combined Sewer System Long Term Control Plan. He agrees with Ricca's analysis that the city's sewer system is not large enough to handle the flow of the storm waters. Norris stated: "It's a self-evident situation, that if the basements are flooding, there's a sewer problem." Norris further explained: "[T]he city monitors the level of the water in that trunk sewer. And when it approaches a point where [flooding] may become a risk, and I'm sure they have a fixed policy for this, then they open the gates to relieve the sewer." Appellees' counsel asked: "But in order to properly operate the system, there would need to be some kind of policy in place as to how–what the water level of Lawson Run is?" Norris answered, "Right." Norris did not, however, determine how the city monitors the water level in Lawson Run.

{¶ 11} Michael D. Shaw, a former city utilities director agreed with Ricca and Norris that the current sewer system is overburdened and incapable of handling all of the flow.

{¶ 12} David Vance, acting chief operator of the waste water treatment plant, stated that if a plant operator completely raises the weir gates to the maximum height, then water will probably back up into Lawson Run and "will probably start blowing

manhole lids off."   He stated that the city did not have a set policy regarding the lowering or raising of gates, but left the decision to the individual operator's discretion. Vance further explained that the city's general policy is to hold the water from bypassing the treatment plant for as long as possible.

{¶ 13} On April 5, 2007, appellees filed an amended complaint and alleged that appellant was negligent in the operation of the sewer system "by purposely causing an obstruction to be placed in the line through the closing of a gate which caused the system to back up, altering the hydraulic grade of the system and ultimately causing the property of [appellees] to become flooded with raw sewage."   Appellant later filed a supplement to its summary judgment motion that addressed appellees' negligent operation claim and asserted that no genuine issues of material fact remained regarding that claim.   Appellant argued that it operates the sewer system to comply with EPA directives that require it to avoid polluting the Ohio River.   Appellant argued that the "EPA permit requires the maximum use of the Lawson's Run collection sewer system for storage of wet weather flow prior to allowing a CSO."   The permit states that appellant "shall maximize the in-line storage capacity."   Appellant asserted that allowing a CSO would violate the requirements of the EPA permit and result in unnecessary pollution of the Ohio River.   Appellant contended that its decision whether to permit a CSO or to maximize the in-line storage capacity constitutes a discretionary function for which it is entitled to sovereign immunity.

{¶ 14} Appellant submitted the affidavit of Richard Duncan, Director of Wastewater at the City of Portsmouth Wastewater Treatment Plant, to support its arguments.   Duncan stated that under the EPA permit, the city is not allowed to

discharge any wastewater into the Ohio River or the Scioto River unless it abides by the rules set forth in the permit. He stated that the EPA permit requires the city to maximize the amount of wastewater, including storm water and sewage, from the Lawson's Run sewer system held in the diversion chamber so that the wastewater can be treated prior to discharge in the Ohio River. Duncan explained that to prevent a CSO, appellant must use portions of the Lawson Run sewer system as storage. By placing the weir gates in the up position, the city maximizes the use of the diversion chamber and allows the Lawson Run sewer to hold excess untreated wastewater. Duncan averred that this practice not only complies with the EPA permit, but also benefits the environment by reducing pollution to the Ohio River.

{¶ 15} In their memorandum contra, appellees alleged that the city's claim that the EPA permit requires it to keep the gates closed and to use the sewer system as a holding tank is simply false. Appellees argued "[Appellant] in effect is saying to this court that the Ohio EPA is requiring [appellee] to flood the homes of it's [sic] residents with sewage. This assertion is assinine. The Ohio EPA permit plainly states that [appellee] is permitted to release effluent during wet weather periods when the flow exceeds capacity. The Ohio EPA is not requiring [appellee] to flood the homes of it's [sic] residents with sewage."

{¶ 16} On July 18, 2008, the trial court denied appellant's summary judgment request and determined that some evidence existed that appellant failed to develop "a coherent maintenance plan for the sewers and [its] lack of maintenance to the sewers may have caused the pled damages." The court observed that a political subdivision is not immune if it fails to maintain its sewer systems. The court found that appellant

"has mischaracterized [appellees'] complaint as being a claim against [appellee] for failed design of the sewer system. [Appellees'] claim against [appellant] rests on the notion that, due to failed maintenance the sewer system has become, in essence, a combination sewer system by taking in excess rainfall through tree roots, cracks, and decaying mortar joints in the sewage lines.   This allegation is clearly one sounding in negligent maintenance, not negligent design, and is supported by [appellees'] expert witness."   The court, however, did not address appellees' claim that appellant negligently operated the sewer system.

{¶ 17} Appellant appealed the trial court's decision that denied it statutory immunity.   Upon appeal, we determined that because the trial court's decision did not determine appellant's liability with respect to appellees' negligent operation claim, the trial court's judgment did not constitute a final, appealable order.   See Essman v. Portsmouth, Scioto App. No. 08CA3244, 2009-Ohio-3367.   Thus, we remanded the matter.   On remand, the trial court determined that appellant is not entitled to immunity regarding appellees' claim that appellant negligently operated the sewer system so as to cause appellees' properties to flood.   This appeal followed.

I.

{¶ 18} In its sole assignment of error, appellant asserts that the trial court wrongly determined that it is not entitled to statutory immunity under R.C. Chapter 2744 and, thus, improperly overruled its summary judgment request.   Appellant contends that (1) its design, planning, construction, or re-construction of the city's sewer system is a governmental function for which it is entitled to immunity; and (2) even if an exception to immunity exists, R.C. 2744.03(A)(5) (the discretionary defense) re-instates its immunity

because its decision to avoid a CSO by using the sewer system as additional storage during significant rain events amounts to a discretionary decision thus entitled to immunity.

{¶ 19} Appellees strenuously dispute appellant's assertion that their complaint alleges negligent design or construction of the sewer.   Rather, appellees maintain that appellant is not immune from liability because their complaint alleges that appellant negligently operated the sewer system.   Appellees assert that appellant was negligent in operating the system because (1) it failed to monitor the water level in the system so as to prevent sewage intrusions on their properties, and (2) it did not have a wastewater treatment plant policy regarding the raising or lowering of the weir gates to control the water level in the sewer system.   Appellees also argue that appellant is not entitled to invoke the discretionary defense for its failure to properly operate the sewer system.

A

SUMMARY JUDGMENT STANDARD

{¶ 20} Appellate courts review trial court summary judgment decisions de novo. Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241. Accordingly, appellate courts must independently review the record to determine if summary judgment is appropriate.   In other words, appellate courts need not defer to trial court summary judgment decisions.   See Brown v. Scioto Cty. Bd. of Commrs. (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153; Morehead v. Conley (1991), 75 Ohio App.3d 409, 411-412, 599 N.E.2d 786.   Thus, to determine whether a trial court properly awarded summary judgment, an appellate court must review the Civ.R. 56 summary judgment standard as well as the applicable law.   Civ.R. 56(C) provides:

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.   No evidence or stipulation may be considered except as stated in this rule.   A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor.

{¶ 21} Accordingly, trial courts may not grant summary judgment unless the evidence demonstrates that (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and after viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made.   See, e.g., Vahila v. Hall (1997), 77 Ohio St.3d 421, 429-430, 674 N.E.2d 1164.

B

R.C. CHAPTER 2744

{¶ 22} R.C. Chapter 2744 establishes a three-step analysis to determine whether a political subdivision is immune from liability.   See, e.g., Cramer v. Auglaize Acres, 113 Ohio St.3d 266, 270, 2007-Ohio-1946, 865 N.E.2d 9, at ¶14.   First, R.C. 2744.02(A)(1) sets forth the general rule that a political subdivision is immune from tort liability for acts or omissions connected with governmental or proprietary functions. See, e.g., Cramer; Colbert v. Cleveland, 99 Ohio St.3d 215, 2003-Ohio-3319, 790 N.E.2d 781, at ¶7; Harp v. Cleveland Hts. (2000), 87 Ohio St.3d 506, 509, 721 N.E.2d

1020.   The statute states: "Except as provided in division (B) of this section, a political

subdivision is not liable in damages in a civil action for injury, death, or loss to person or

property allegedly caused by any act or omission of the political subdivision or an

employee of the political subdivision in connection with a governmental or proprietary

function."

{¶ 23} Second, R.C. 2744.02(B) lists five exceptions to the general immunity

granted to political subdivisions under R.C. 2744.02(A)(1).   See, e.g., Cramer; Ryll v.

Columbus Fireworks Display Co., 95 Ohio St.3d 467, 470, 2002-Ohio-2584, 769 N.E.2d

372, at ¶25.   As relevant in the case sub judice, R.C. 2744.02(B)(2) states:

> Except as otherwise provided in sections 3314.07 and 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions.

{¶ 24} Finally, if liability exists under R.C. 2744.02(B), R.C. 2744.03(A) sets forth

several defenses that re-instate a political subdivision's immunity.   See Cramer;

Colbert at ¶9.   In the case at bar, appellant also claims that R.C. 2744.03(A)(5) applies:

> The political subdivision is immune from liability if the injury, death, or loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner.

Whether a political subdivision is entitled to statutory immunity under R.C. Chapter

2744 presents a question of law.   See, e.g., Conley v. Shearer (1992), 64 Ohio St.3d

284, 292, 595 N.E.2d 862; Murray v. Chillicothe, Ross App. No. 05CA2819,

2005-Ohio-5864, at ¶11.

{¶ 25} In the case sub judice, the parties do not dispute that appellant is entitled

to the general grant of immunity under R.C. 2744.02(A)(1).   Instead, the dispute

focuses on whether the R.C. 2744.02(B)(2) exception to immunity applies, and, if so,

whether R.C. 2744.03(A)(5) re-instates immunity.


C

R.C. 2744.02(B)(2)

{¶ 26} Appellees assert that R.C. 2744.02(B)(2) excepts appellant from the

general grant of immunity.   Appellees argue that their property damage resulted from

appellant's negligent performance of a proprietary function.   Appellees contend that

appellant was negligent in the "maintenance, * * * operation, and upkeep" of the sewer

system, which R.C. 2744.01(G)(2)(d) defines as a proprietary function.

{¶ 27} The city counters that appellees have failed to set forth any facts to show

that it was negligent in the maintenance, operation, or upkeep of the sewer system.

The city argues that a true analysis of the facts shows that appellees actually seek to

hold appellant liable for the design of the sewer system, which R.C. 2744.01(C)(2)(l)

defines as a governmental function.   Thus, because appellees' true complaints rest

upon a governmental function (i.e., its design of the sewer system), R.C. 2744.02(B)(2)

does not apply and the city is entitled to the R.C. 2744.02(A)(1) general grant of

immunity.

{¶ 28} R.C. 2744.02(B)(2) subjects a political subdivision to liability for "the

negligent performance of acts by their employees with respect to proprietary functions

of the political subdivisions."   Thus, before this provision removes a political

subdivision's immunity, a plaintiff must demonstrate that the political subdivision's

employees negligently performed a proprietary function.   Accordingly, before R.C.

2744.02(B)(2) will remove a political subdivision's immunity, the plaintiff must establish:

(1) the elements required to sustain a negligence action–duty, breach, proximate cause,

and damages; and (2) that the negligence arose out of a "proprietary function."   See,

generally, Gabel v. Miami E. School Bd. 169 Ohio App.3d 609, 2006-Ohio-5963, 864

N.E.2d 102, at ¶¶39-40.   A "proprietary function" includes "[t]he maintenance,

destruction, operation, and upkeep of a sewer system."   R.C. 2744.01(G)(2)(d).

{¶ 29} Under R.C. 2744.02(B)(2), a political subdivision cannot be held liable for

the negligent performance of acts by their employees with respect to a governmental

function.   A "governmental function" includes "[t]he provision or nonprovision, planning

or design, construction or reconstruction of * * * a sewer system."   R.C.

2744.01(C)(2)(l).

{¶ 30} In the case at bar, the initial inquiry is whether appellees' allegations are

based upon appellant's negligent performance of the maintenance, operation, or

upkeep of the sewer system, or whether they are based upon appellant's planning or

design, construction or reconstruction of the sewer system.

{¶ 31} Ohio courts have long recognized that a city can be liable for the negligent

maintenance of its sewers.   See Portsmouth v. Mitchell Mfg. Co. (1925), 113 Ohio St.

250, 255, 148 N.E. 846; Kiep v. Hamilton (May 19, 1997), Butler App. No. CA96-08-158

("[I]f a city accepts the responsibility to maintain a sewer and is then negligent in its

inspection and/or maintenance of the sewer, the city may be liable for damages

proximately caused by its negligence.").   In Mitchell Mfg. Co., the Ohio Supreme Court

held:

> "The weight of authority holds that the construction and institution of a sewer system is a governmental matter, and that there is no liability for mere failure to construct sewers.   However, the weight of authority is equally decisive in holding that the operation and upkeep of sewers is not a governmental function, but is a ministerial or proprietary function of the city.
>
> The obligation to repair is purely ministerial.   When, therefore, a municipal corporation assumes the control and management of the sewer or drain which has been constructed in a public street under its supervision, it is bound to use reasonable diligence and care to keep such sewer or drain in good repair, and is liable in damages to any property owner injured by its negligence in this respect."

(Citations omitted).

The court announced a similar rule in Doud v. Cincinnati (1949), 152 Ohio St. 132, 137,

87 N.E.2d 243:

> "A municipality is not obliged to construct or maintain sewers, but when it does construct or maintain them it becomes its duty to keep them in repair and free from conditions which will cause damage to private property * * *. The municipality becomes liable for damages caused by its negligence in this regard in the same manner and to the same extent as a private person under the same circumstances."

{¶ 32} Determining whether an allegation of negligence relates to the

maintenance, operation, or upkeep of a sewer system or, instead, the design,

construction, or reconstruction of a sewer system is not always a simple inquiry.

However, some general rules have been established.   For example, it appears to be

well-established that "decisions regarding sewer lines to be tapped into an existing

sewer constitute an operation or management of an existing sewer system" and not a

design, construction, or reconstruction issue.   See Lancione v. Dublin (Sept. 29, 1992),

Franklin App. No. 92AP-244, citing Ball v. Reynoldsburg (1963), 175 Ohio St. 128, 192

N.E.2d 51; see, also, Sparks v. Erie County Bd. of County Com'rs (Jan. 16, 1998), Erie

App. No. E-97-007.   Furthermore, when remedying the sewer problem would involve

little discretion but, instead, would be a matter of routine maintenance, inspection, repair, removal of obstructions, or general repair of deterioration, then the complaint is properly characterized as a maintenance, operation, or upkeep issue.   See Martin v. Gahanna, Franklin App. No. 06AP-1175, 2007-Ohio-2651, at ¶17 (stating that "the need to inspect and replace missing components necessary for the safe operation of the storm water system clearly falls within the definition of maintenance or upkeep of a sewer system"); Zimmerman v. Summit County (Jan. 15, 1997), Summit App. No. 17610.   When remedying a problem would require a city to, in essence, redesign or reconstruct the sewer system, then the complaint presents a design or construction issue.   See Zimmerman.   For example, in Zimmerman the plaintiff alleged that the political subdivision negligently maintained and operated the sewer system.   The court disagreed with the plaintiff's characterization of the issue as negligent maintenance and operation after it looked to what the political subdivision would be required to do to remedy the problem.   The court observed that remedying the problem would require the city to essentially redesign the system.   Thus, the plaintiff's true allegation constituted a claim of negligent design.   The court explained:

> "Plaintiffs' claimed injuries and losses, however, were not caused by defendant's maintenance and operation of its sewer system.   Unlike other cases in which Ohio courts have recognized that actions taken with respect to sewer systems were proprietary in nature, plaintiffs' claimed injuries and losses did not arise from defendant's failure to repair damage to the system, to inspect it, to remove obstructions, or to remedy general deterioration.   See Doud v. Cincinnati (1949), 152 Ohio St. 132 (city allegedly failed to detect deterioration of sewer system) and Nice v. Marysville (1992), 82 Ohio App.3d 109 (city failed to detect and repair damage to sewer system).   Instead, they resulted from defendant's original design and construction of the sewer system.   As evidenced by Jeffrey Lintern's affidavit, defendant's decision to pump sewage and rain water into the stream was a response to the sewer system's inability as

designed and constructed to handle the volume of materials that currently pass through it.   This was not a problem that defendant could remedy through routine maintenance.   It would require extensive redesigning and reconstructing of the system to meet current demands."

{¶ 33} Another rule courts have developed is that when a sewer system operates as it was designed to do, a claim of negligent operation will fail.   See Gabel, supra; Alden v. Summit Cty. (1996), 112 Ohio App.3d 460, 463-464, 679 N.E.2d 36.   In Gable, the evidence showed that the wastewater treatment facility operated exactly as planned and intended.   The court observed that the facility was specifically designed to discharge treated wastewater onto the plaintiffs' property at the site of a stormwater easement, and that is precisely what happened.   The court thus concluded that the plaintiffs could not establish that the political subdivision negligently operated the facility.

{¶ 34} In Alden, the court likewise held that the plaintiffs failed to set forth evidence to show that the county negligently maintained or operated the sewer system when the system operated as intended and as planned.   In Alden, the plaintiffs experienced sewage intrusions onto their property when the sewer system became overloaded following heavy rains.   The sewer system was equipped with a bar screen that allowed overflowing water from the sewer to escape from the system through a bypass door.   The bypass door emptied the overflowing water into a watercourse (known as "Mud Brook") that ran through the plaintiffs' property.   Unfortunately, the overflowing water caused sewage intrusions on the plaintiffs' property.   The plaintiffs sued the county and alleged, inter alia, negligent maintenance and repair of the sewer system.   The county argued that it was entitled to statutory immunity because the

system was originally designed with the bar screen and that the system operated as designed. Nevertheless, the plaintiffs asserted that the county's twenty-six year failure to remedy the problem constituted negligence.

{¶ 35} To support its summary judgment request, the county presented the affidavit of an expert who stated that the sewer system was designed to include a bar screen and bypass line in order to prevent the main sewer line from clogging by releasing excess rainwater and sewage, which, in turn, would prevent backups into residential basements and out of manhole covers. The county's expert testified that the overflows occur due to severe rain storms and that these overflows occur even though the county routinely inspects and cleans the sewer system. Although the plaintiffs asserted that the county had negligently maintained the sewer system, the court determined that none of the plaintiffs' evidence rebutted the county's evidence that the sewer system was designed to include the bar screen and the bypass to provide access for overflows and that the system operated as intended. The court stated:

> "The fact that the county designed the sewer system with the bar screen and bypass as part of the system, with the intent to allow water and sewage to escape onto land, supports the determination that this decision was exercised as part of the county's governmental function. It is apparent that the sewer system needs this type of mechanism to accommodate the overflow. The decision to have the bar screen and bypass and place it near Mud Brook was committed to the governmental, and thus discretionary, function of the county."

Id. at 464. The court thus concluded that although the plaintiffs attempted to couch their complaint in terms of negligent maintenance or operation, their actual complaint related to the original design of the system for which the city had immunity.

{¶ 36} In Duvall v. Akron (Nov. 6, 1991), Summit App. No. 15110, the court examined the plaintiff's allegations that the city negligently failed to keep the sewer in repair to prevent sewer backups and determined that his true complaint was that the city failed to update the sewer system despite a repeated history of sewage intrusions. In Duvall, the plaintiff filed a complaint against the city after repeated sewage intrusions into his home. He alleged that the city negligently failed to keep the sewer in repair and to prevent sewage backups. The trial court determined that the city was entitled to statutory immunity. On appeal, the court determined that the plaintiff failed to set forth any facts to support his negligent maintenance theory. The court instead concluded that the plaintiff's true complaint was that the city failed to update the sewer system despite the repeated history of sewage intrusions. The court found that the plaintiff's claim that the city negligently failed to update the sewer system did not constitute negligence in the performance of a proprietary function, i.e., maintenance, operation, or upkeep. Rather, the court determined that the decision to update an existing sewer system constituted a discretionary, governmental function. The court explained:

> "In responding to the motion for summary judgment, Duvall asserts that the sewer line was altered from its original course, that the system is inadequate to properly control the volume of use, that additional pumps are needed, and that no action has been taken to alleviate the backups despite regular inspections. Further, Duvall asserts that despite the flooding, the city has failed to update the system. Duvall may be correct in asserting that the system altered fifty-one years ago is inadequate to meet the current residential demands and that pumps or a general update of the system are indicated. Nevertheless, these remedies lie within the discretionary governmental functions of Akron. Akron was immune from liability when it exercised its judgment fifty-one years ago and planned sewer construction calling for the sewer tie-in to be altered. Akron remains immune from liability when it exercises its judgment in determining whether to acquire equipment, such as pumps, and in determining how to allocate its limited financial resources, with regard to

updating the sewer system."

{¶ 37} Although Duvall and Alden rejected claims that the political subdivision's failure to update an inadequate system constituted negligent maintenance, operation, or upkeep, other courts have concluded that "the failure to upgrade sewers that are inadequate to service upstream property owners despite sufficient notice of the inadequacy can best be described as a failure to maintain or upkeep the sewer." H. Hafner & Sons, Inc. v. Cincinnati Metro. Sewer Dist. (1997), 118 Ohio App.3d 792, 797, 694 N.E.2d 111, appeal not allowed, 79 Ohio St.3d 1460, 681 N.E.2d 442; see, also, Moore v. Streetsboro, Portage App. No. 2008-P-0017, 2009-Ohio-6511. In Hafner, the court held that the political subdivision is liable under R.C. 2744.02(B)(2) when it had eleven years' notice that the sewer overflowed onto the plaintiff's property and when the political subdivision did not take action to solve the problem. In Hafner, a combination storm and sanitary sewer erupted and deposited sewage on the plaintiff's property. To prevent damage to the water treatment plant, the political subdivision controlled the water that flowed into the treatment plant by closing a sluice gate. When the political subdivision closed the sluice gate, the sewer backed up through manholes located on the plaintiff's property. This event happened on an annual basis. The political subdivision knew of the sewage backup since 1983, but did nothing to alleviate the problem. In seeking to hold the political subdivision liable, the plaintiff asserted that the property damage resulted from the political subdivision's operation of the sewer system. The political subdivision argued that the damage resulted, instead, from its design of the sewer system. Both parties agreed, however, that the political subdivision's decision to close the sluice gate caused the plaintiff's damage.

{¶ 38} The trial court awarded summary judgment in the political subdivision's favor, but the court of appeals reversed that judgment. The appellate court determined that whether the closing of the gate involved the exercise of judgment and discretion and whether the political subdivision closed the gate in good faith amounted to questions of fact. The court further determined that "the dispositive act" was the political subdivision's "failure to maintain the sewer servicing upstream property owners–or more specifically, [the political subdivision's] failure to upgrade the sewer from its original design to adequately accept the flow of sanitary effluents, despite eleven years of notice that the sewer periodically, and eventually annually, backed up and deposited raw sewage and human waste on [the plaintiff's] property." Id. at 796. The court held that "the failure to upgrade sewers that are inadequate to service upstream property owners despite sufficient notice of the inadequacy can best be described as a failure to maintain or upkeep the sewer." Id. at 797.

{¶ 39} We find Hafner distinguishable from the case at bar. In Hafner, the court did not expressly consider whether the city's decision not to upgrade the system was entitled to discretionary immunity under R.C. 2744.03(A)(5). Moreover, in Hafner, unlike in the case at bar, the political subdivision did not have a competing concern of preventing pollution to navigable waters. In the case at bar, appellant has competing concerns: avoiding a CSO and preventing sewage intrusions onto its residents' properties. Furthermore, to the extent our holding conflicts with Hafner, we disagree with its holding. In particular, we believe that Hafner improperly interpreted R.C. 2744.01(G)(2)(d) so as to equate "upgrade" with "maintenance, operation, or upkeep."

{¶ 40} In Washington Cty. Home v. Ohio Dept. of Health, 178 Ohio App.3d 78,

2008-Ohio-4342, 896 N.E.2d 1011, at 27-29, we set forth the analysis that we apply

when interpreting a statute:

> "The interpretation of a statute involves a purely legal question. Thus, we conduct a de novo review of a trial court's judgment interpreting a statute and afford no deference to the trial court's interpretation of a statute.   See, e.g., Oliver v. Johnson, Jackson App. No. 06CA16, 2007-Ohio-5880, 2007 WL 3227668, at ¶5.
> In construing a statute, a court's paramount concern is the legislature's intent in enacting it.   See, e.g., State ex rel. Cincinnati Enquirer v. Jones-Kelley, 118 Ohio St.3d 81, 2008-Ohio-1770, 886 N.E.2d 206, at ¶17; State ex rel. Russell v. Thornton, 111 Ohio St.3d 409, 2006-Ohio-5858, 856 N.E.2d 966, ¶11.   ""The court must look to the statute itself to determine legislative intent, and if such intent is clearly expressed therein, the statute may not be restricted, constricted, qualified, narrowed, enlarged or abridged; significance and effect should, if possible, be accorded to every word, phrase, sentence and part of an act * * *.""   State ex rel. McGraw v. Gorman (1985), 17 Ohio St.3d 147, 149, 17 OBR 350, 478 N.E.2d 770, quoting Wachendorf v. Shaver (1948), 149 Ohio St. 231, 36 O.O. 554, 78 N.E.2d 370, paragraph five of the syllabus.   To determine legislative intent, a court must ""read words and phrases in context and construe them in accordance with rules of grammar and common usage.""   Id., quoting State ex rel. Russell v. Thornton, 111 Ohio St.3d 409, 2006-Ohio-5858, 856 N.E.2d 966, ¶11.   "'In construing the terms of a particular statute, words must be given their usual, normal, and/or customary meanings.'" Proctor v. Kardassilaris, 115 Ohio St.3d 71, 2007-Ohio-4838, 873 N.E.2d 872, ¶¶ 12.
> When the language of a statute is plain and unambiguous and conveys a clear and definite meaning, there is no need to apply rules of statutory construction.   Id.; see also Cline v. Ohio Bur. of Motor Vehicles (1991), 61 Ohio St.3d 93, 96, 573 N.E.2d 77; Sears v. Weimer (1944), 143 Ohio St. 312, 28 O.O. 270, 55 N.E.2d 413, paragraph five of the syllabus.   However, when a statute is subject to various interpretations, a court may invoke rules of statutory construction to arrive at legislative intent.   R.C. 1.49; Cline, supra; Carter v. Youngstown (1946), 146 Ohio St. 203, 32 O.O. 184, 65 N.E.2d 63, paragraph one of the syllabus."

{¶ 41} We begin our analysis of the statute by examining the plain meanings of

the terms "maintenance, operation, and upkeep" and "upgrade" to determine whether

the Hafner court properly found the terms to be synonymous.   Webster's Encyclopedic

Dictionary (1989) defines "maintenance" as "a maintaining or being maintained."   Id. at

601. "Maintain" is defined as "to cause to remain unaltered or unimpaired." Id. Webster's does not define "unaltered or unimpaired," but it does define "alter" and "impair." "Alter" means "to make different, modify, change." Id. at 27. "Impair" means "to lessen in quality or strength, damage." Id. at 485. Merriam-Webster's online dictionary defines "maintenance" as "the act of maintaining: the state of being maintained. http://www.merriam-webster.com/dictionary/maintenance. To "maintain" means "to keep in an existing state (as of repair, efficiency, of validity): to preserve from failure or decline." http://www.merriam-webster.com/dictionary/maintain. We find this latter definition most appropriate to define the term "maintenance" as used in R.C. 2744.01(g)(2)(d). Thus, as used in the statute, "maintenance" means the act of keeping the sewer in its existing state of repair and to preserve it from failure or decline.

{¶ 42} Webster's defines "operation" as "the act of operating, or an instance of this" or "the way in which a thing works." Webster's, supra, at 703. To "operate" means "to be in action, function" or "to put into action, cause to work." Id. Merriam-Webster's online dictionary defines "operation" as "performance of a practical work or of something involving the practical application of principles or processes" or "the quality or state of being functional or operative" or "a method or manner of functioning." http://www.merriam-webster.com/dictionary/ operation.

{¶ 43} Merriam-Webster's defines "upkeep" as "the act of maintaining in good condition: the state of being maintained in good condition." http://www.merriam-webster.com/dictionary/ upkeep. Webster's defines "upkeep" as "the maintenance of buildings, roads, equipment, etc." Webster's, supra, at 1081.

{¶ 44} An "upgrade" is but another word for improvement.

http://www.merriam-webster.com/dictionary/upgrade. Thus, to "upgrade" is to

"improve." To improve means "to enhance in value or quality: make better."

http://www.merriam-webster.com/ dictionary/improve. Because an upgrade to a sewer

system would mean enhancing the system's value, upgrade is not synonymous with

upkeep. "Upkeep" means "the act of maintaining in good condition." Upgrading a

sewer system would require more than retaining the system in good condition.

Upgrading involves more than simple maintenance. Rather, upgrading involves a

positive act of improvement. The Ohio General Assembly did not specify the upgrade

of a sewer system as a proprietary function. Thus, we believe that Hafner and Moore,

which hold that a failure to upgrade or update an inadequate sewer system is the

equivalent of a failure to maintain or upkeep, are misguided and do not apply a proper

statutory interpretation analysis. Rather, we believe that a political subdivision's

decision regarding an upgrade of its sewer system is a governmental function. A

decision to upgrade requires a political subdivision to weigh various considerations,

including the availability of fiscal resources, the use and acquisition of additional

equipment, and the overall design of the system. See Duvall; Alden.

{¶ 45} With the foregoing principles in mind, we now examine appellees'

allegations to determine whether they allege negligence with respect to a proprietary

function or a governmental function. Appellees have alleged that the city failed to

properly maintain, operate, or upkeep the sewer system in the following respects: (1)

appellant allowed additional development without ensuring that the sewer system would

be adequate to serve the existing properties and the additional development; (2)

appellant failed to monitor the water levels in the sewer system so as to prevent

sewage intrusions onto appellees' properties; (3) appellant failed to operate the weir gates so as to prevent sewage intrusions onto appellees' properties; (4) appellant failed to define procedures regarding the raising or lowering of the weir gates for the wastewater treatment plant operators to follow during wet weather periods; and (5) appellant failed to upgrade the sewer system.

{¶ 46} We believe that when the city allowed additional development without ensuring that the sewer system would be able to accommodate the increased flow, the city did not fail to maintain, operate, or upkeep the system. The additional development did not cause the sewer system to no longer be in good repair. The sewer system remained the same. Any change that resulted was a change in the above-ground development and this allegedly caused an increase in the water flow through the sewers. However, an increase in the amount of water flowing through the sewer does not fall within any of the definitions of maintenance, operation, or upkeep of the sewer system. Cf. Ferguson v. Breeding (Aug. 25, 2000), Lawrence App. No. 99CA22 (concluding that a political subdivision is immune from liability when flooding to private property was a result of an improperly designed sewer that was inadequate to handle increased storm runoff). The structural components of the sewer system continued to be maintained, operated, and kept in the same state. The only change in the system was the amount of water that flowed through the system. Appellees' allegation is that appellant failed to upgrade its sewers to handle increased flow. As we determined, however, a city's decision regarding an upgrade to its sewer system is a governmental function for which it is entitled to immunity. Moreover, to remedy this complaint, appellant would be required to perform extensive redesigning or

reconstructing of the sewer system. Although appellees' couch this claim in terms of negligent maintenance, operation, or upkeep, their true complaint is that the city simply failed to upgrade the sewer system. We, therefore, do not believe that the city's decision to allow additional development in the area without a concomitant update to the sewer system constitutes a failure to maintain, operate, or upkeep the sewer system. See Duvall; Alden; Zimmerman. For this same reason, the city is entitled to immunity regarding appellees' claim that the city negligently failed to maintain, operate, or upkeep the sewer by failing to upgrade the system.

{¶ 47} Next, we believe that the city is entitled to immunity with respect to appellees' claim that the city negligently operated the system by failing to monitor the water levels. It is important to note that this particular sewer system is not designed to have water monitors. Thus, the city is not improperly maintaining the sewer system in its current state or failing to keep it in good repair. Furthermore, the city is not failing to operate the system as it is intended to operate, i.e., without water monitors. The allegation that the sewer system should have water monitors relates to the original design of the system or a re-design of the current system. The city, therefore, is entitled to immunity regarding this claim as it involves a governmental function, i.e., the original design of the sewer system. See Alden.

{¶ 48} We, however, agree with appellees that the city could be subject to liability under R.C. 2744.02(B)(2) for its operation of the weir gates. The weir gates are part of the operation of the sewer system. Appellees allege that the city negligently operated the gates by positioning them so that the excess wastewater is stored in the sewer system, which allegedly results in the sewage intrusions on their properties. Appellees

claim that the city should position the gates to allow the excess wastewater to bypass the water treatment plant and flow into the Ohio River.   It is important to note that appellees do not claim that the weir gates fail to function as intended, i.e., controlling the flow of water into the diversion chamber.   Instead, appellees complain about the manner and method of the weir gate's operation.   Appellees basically assert that the city has made poor decisions regarding the raising or lowering of the gates which, in turn, allegedly resulted in the sewage intrusions.   Although we have reservations about whether this complaint concerns a proprietary function, for the limited purpose of deciding this case, we will assume that it is.   Thus, we believe for purposes of argument, that appellees set forth sufficient facts to demonstrate the existence of genuine issues of material fact regarding whether the city was negligent in its operation of the sewer system's weir gates.   Some evidence exists that the position of the weir gates during heavy rain events may contribute to the flooding of appellees' properties. Consequently, the city may be subject to liability under R.C. 2744.02(B)(2) regarding appellees' claim that it negligently operated the weir gates.

{¶ 49} Appellees further allege that the city negligently operated the system by failing to set forth a procedure regarding the raising and lowering of the weir gates for the plant operators to follow during wet weather periods.   Appellees assert that the city left the decision whether to raise or lower the weir gates to the individual operator's discretion.   Appellees appear to believe that if the city had a defined procedure in place, then the sewage intrusions would not have occurred.   Although the city may not have specified the exact procedure that the plant operators should have followed when the water level exceeded the system's capacity, the evidence shows that the city's

general policy was to hold the excess water as long as possible to avoid a CSO.   While

we question whether a defined procedure would have altered the city's policy of

preventing a CSO as long as possible or preventing sewage intrusions onto appellees'

properties, we believe that a sufficient factual question remains regarding the city's

negligence in this regard to subject it to liability under R.C. 2744.02(B)(2).   The city,

therefore, is potentially subject to liability for its alleged negligent failure to define a

procedure for the plant operators to follow during wet weather periods.

{¶ 50} Appellees also allege that appellant negligently maintained the system

because it did not have any type of maintenance plan.   However, even if we assume

that the city was negligent due to its failure to have a maintenance plan, appellees'

evidence fails to show how a maintenance plan would have prevented the sewage

intrusions.   Moreover, appellees' evidence does not specify what type of maintenance

plan the city should have implemented and how the failure to implement this particular

maintenance plan resulted in the sewage intrusions.

{¶ 51} Accordingly, based upon the foregoing reasons, we agree with appellees

that appellant may be subject to liability under R.C. 2744.02(B)(2) regarding their claim

that the city negligently operated the weir gates and their claim that the city was

negligent in its operation of the system for failing to have a defined policy regarding the

opening or closing of the weir gates.   However, appellees have not produced any

evidence to support a claim of negligent maintenance.   Thus, the city is entitled to

summary judgment regarding appellees' negligent maintenance claim.   Because the

remaining claims are based upon appellant's alleged negligence in the performance of

its governmental functions, the city retains its R.C. 2744.02(A)(1) immunity with respect

to those claims.

D

R.C. 2744.03(A)(5)

{¶ 52} Although R.C. 2744.02(B)(2) may remove the city's general grant of immunity with respect to appellees' negligent operation claims, R.C. 2744.03(A)(5) may re-instate the city's immunity.   The statute provides:

{¶ 53} "The political subdivision is immune from liability if the injury, death, or loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner."

{¶ 54} The R.C. 2744.03(A)(5) defense extends to activities that involve weighing alternatives or making decisions involving a high degree of official judgment or discretion.   See Enghauser Mfg. Co. v. Eriksson Engineering Ltd.(1983), 6 Ohio St.3d 31, 451 N.E.2d 228, paragraph two of the syllabus.   Political subdivisions are immune from liability for "'certain acts which go to the essence of governing,' i.e., conduct characterized by a high degree of discretion and judgment in making public policy choices."   Butler v. Jordan (2001), 92 Ohio St.3d 354, 375, 750 N.E.2d 554, quoting Enghauser Mfg. Co., 6 Ohio St.3d at 35.   In other words, "'immunity attaches only to the broad type of discretion involving public policy made with the creative exercise of political judgment.'"   McVey v. Cincinnati (1995), 109 Ohio App.3d 159, 163, 671 N.E.2d 1288, quoting Bolding v. Dublin Local Sch. Dist. (June 15, 1995), Franklin App.

No. 94APE09-1307; see, also, Perkins v. Norwood City Schools (1999), 85 Ohio St.3d 191, 707 N .E.2d 868 (Cook, J., concurring).

{¶ 55} "To qualify for immunity, the subdivision's function must require it to weigh multiple considerations, 'not merely to "rubber stamp" [a proposal] found to be in compliance with all requisite technical requirements.'" Drew v. Laferty (June 1, 1999), Vinton App. No. 98CA522, quoting Winwood v. Dayton (1988), 37 Ohio St.3d 282, 284, 525 N.E.2d 808.   As we explained in Hall v. Ft. Frye Loc. School Dist. Bd. of Edn. (1996), 111 Ohio App.3d 690, 699, 676 N.E.2d 1241: "Immunity operates to protect political subdivisions from liability based upon discretionary judgments concerning the allocation of scarce resources; it is not intended to protect conduct which requires very little discretion or independent judgment.   The law of immunity is designed to foster freedom and discretion in the development of public policy while still ensuring that implementation of political subdivision responsibilities is conducted in a reasonable manner."   See, also, Hubbell v. Xenia 175 Ohio App.3d 99, 2008-Ohio-490, 885 N.E.2d 290, at ¶18, quoting Addis v. Howell (2000), 137 Ohio App.3d 54, 60, 738 N.E.2d 37 ("'Some positive exercise of judgment that portrays a considered adoption of a particular course of conduct in relation to an object to be achieved is required in order to demonstrate an exercise of discretion for which R.C. 2744.03(A)(5) confers immunity from liability on a political subdivision.'").

{¶ 56} In the case at bar, we believe that the city's operation of the weir gates so as to regulate the water flow within its sewer system to prevent untreated wastewater from flowing into the Ohio River constitutes a discretionary decision under R.C. 2744.03(A)(5).   The EPA permit prohibits appellant from releasing untreated

wastewater into the Ohio River unless a bypass is "unavoidable to prevent * * * severe property damage."   Appellant is entitled to exercise its discretion and judgment to determine that any potential risk of flooding to appellees' property did not constitute "severe property damage" so as to warrant a bypass.   Furthermore, the EPA permit prohibits a bypass unless "[t]here were no feasible alternatives to the bypass, such as the * * * retention of untreated wastes."   Consequently, the city is entitled to use its exercise of judgment and discretion to interpret this provision to mean that it should retain untreated wastewater as long as possible.

{¶ 57} Moreover, the city's operation of the weir gates is based upon its considered judgment in how to use its facilities, i.e., the sewer system and the wastewater treatment plant.   The city operates the weir gates to avoid a CSO.   The city has weighed the risk of polluting the Ohio River against the possibility that using the Lawson Run sewer as storage for excess water may overload the system and determined that the danger of polluting the Ohio River outweighs the danger of overloading of the sewer system.   The city attempts to maximize the storage capacity to prevent the release of untreated sewage into the Ohio River.   To prevent overloading the system, the city would need to upgrade or expand the system at considerable financial cost.   Consequently, the city exercised its judgment and discretion in determining not to allocate its limited financial resources to reconstructing the sewer system.   See Smith v. Stormwater Management Division (1996), 111 Ohio App.3d 502, 676 N.E.2d 609 (concluding that decision to make improvements to an existing sewer involves the exercise of judgment and discretion).

{¶ 58} We further note the city has not simply ignored appellees' complaints of

sewage intrusions.   Over the years the city attempted to determine the cause of the

sewage intrusions to see if the backups could be prevented or resolved.   The

evidentiary material the parties submitted reveals that the city did not learn, before this

lawsuit was filed, of any correlation between its operation of the weir gates and the

flooding to appellees' properties.   Thus, the instant case is distinguishable from

Holbrook v. Brandenburg, Clark App. No. 2007CA106, 2009-Ohio-2320, appeal not

allowed, 123 Ohio St.3d 1409, 2009-Ohio-5031, 914 N.E.2d 205, in which the court

determined that the township's decision to ignore years of complaints and requests for

help to stem the flooding constituted the exercise of "judgment or discretion" was a

question of fact.

{¶ 59} Additionally, the city is entitled to discretionary immunity regarding

appellees' claim that it negligently operated the sewer system by failing to establish a

defined policy regarding the lowering or raising of the weir gates to prevent sewage

intrusions.   The city's implementation of a policy designed to control water flow through

its sewer system to prevent polluting the Ohio River smacks of a discretionary decision.

 The undisputed evidence establishes that the city had a general policy of holding

untreated wastewater in the sewer system for as long as possible to prevent a CSO.

The treatment plant operators were aware of this general policy.   The treatment plant

operators, as employees of the political subdivision, are entitled to use their individual

judgment and discretion to determine how to use the facility.   See Ellston v. Howland

Loc. Sch., 113 Ohio St.3d 314, 2007-Ohio-, 865 N.E.2d 845, at syllabus (stating that a

political subdivision is immune under R.C. 2744.03[A][5] if alleged injury "resulted from

an individual employee's exercise of judgment or discretion in determining how to use

equipment or facilities unless that judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner"). Thus, the city is entitled to assert the discretionary immunity defense regarding this negligent operation claim.

{¶ 60} Appellees nonetheless claim that even if the city's decision regarding the operation of the sewer system constituted an exercise of judgment and discretion under R.C. 2744.03(A)(5), the city remains liable because it acted with malice, in bad faith, wantonly, or recklessly. We initially note that appellees did not include an allegation of malice, bad faith, or wanton or reckless conduct in their original complaint or any subsequent amendments. Generally, if a complaint fails to allege that the political subdivision acted with malice, bad faith, or wanton or reckless conduct, a court reviewing a summary judgment decision may not consider this issue on appeal. See Elston at ¶31; see, also, Smith v. Martin 176 Ohio App.3d 567, 2008-Ohio-2978, 892 N.E.2d 971, at ¶32 (refusing to consider arguments that political subdivision acted in wanton or reckless manner when complaint failed to contain such allegations); Ohio Bell Tel. Co. v. Digioia-Suburban Excavating, L.L.C., Cuyahoga App. No. 89708, 2008-Ohio-1409 (reversing trial court's denial of summary judgment based on political subdivision immunity when the plaintiffs alleged only negligence and not that the city had acted with malicious purpose, in bad faith or in a wanton or reckless manner); Knotts v. McElroy, Cuyahoga App. No. 82682, 2003-Ohio-5937 (upholding dismissal of plaintiff's complaint on the basis of political subdivision immunity when plaintiff did not allege that the political subdivision acted with culpability greater than mere negligence). Although we could reject appellees' argument on the basis of their failure to allege malice, bad faith, or wanton or reckless conduct in the original complaint or any

amendments, we will consider whether genuine issues of material fact remain as to whether the city maliciously, in bad faith, or wantonly or recklessly operated the sewer system.

{¶ 61} The term "malice" means the willful and intentional desire to harm another, usually seriously, through conduct which is unlawful or unjustified. Hicks v. Leffler (1997), 119 Ohio App.3d 424, 428-429, 695 N.E.2d 777. "Bad faith" implies sinister motive that has "no reasonable justification." Id. at 429. "Bad faith" embraces more than bad judgment or negligence. Id., citing Parker v. Dayton Metro. Hous. Auth. (May 31, 1996), Montgomery App. No. 15556. It imports a "dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another." Id.; Jackson v. Butler Cty. Bd. of Cty. Commrs. (1991), 76 Ohio App.3d 448, 454, 602 N.E.2d 363.

{¶ 62} Wanton misconduct has been defined as the failure to exercise any care whatsoever. See Fabrey v. McDonald Village Police Dept. (1994), 70 Ohio St.3d 351, 356, 639 N.E.2d 31, citing Hawkins v. Ivy (1977), 50 Ohio St.2d 114, 4 O.O.3d 243, 363 N.E.2d 367, syllabus. The Ohio Supreme Court has held that "'mere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor.'" See id., quoting Roszman v. Sammett (1971), 26 Ohio St.2d 94, 96-97, 55 O.O.2d 165, 269 N.E.2d 420. Such perversity requires that the actor be conscious that his conduct will, in all likelihood, result in an injury. See id. Moreover, the standard of proof to show wanton misconduct is high. Id.

{¶ 63} "Reckless" refers to conduct that causes an unreasonable risk of harm

and is "'substantially greater than that which is necessary to make [an actor's] conduct negligent.'" Thompson v. McNeill (1990), 53 Ohio St.3d 102, 104-105, 559 N.E.2d 705, quoting 2 Restatement of the Law 2d, Torts (1965) 587, Section 500.   Likewise, an individual acts recklessly when he or she, bound by a duty, does an act or intentionally fails to do an act, knowing, or having reason to know of, facts that would lead a reasonable person to realize not only that there is an unreasonable risk of harm to another, but also that such risk is substantially greater than that which is necessary for negligence.   See Thompson, 53 Ohio St.3d at 104-105; see, also, Fabrey, 70 Ohio St.3d at 356.

{¶ 64} The Ohio Supreme Court has offered additional guidance when distinguishing between negligent conduct and reckless conduct:

> "'g. Negligence and recklessness contrasted.   Reckless misconduct differs from negligence in several important particulars.   It differs from that form of negligence which consists in mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency, in that reckless misconduct requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man.   It differs not only from the above-mentioned form of negligence, but also from that negligence which consists in intentionally doing an act with knowledge that it contains a risk of harm to others, in that the actor to be reckless must recognize that his conduct involves a risk substantially greater in amount than that which is necessary to make his conduct negligent.   The difference between reckless misconduct and conduct involving only such a quantum of risk as is necessary to make it negligent is a difference in the degree of the risk, but this difference of degree is so marked as to amount substantially to a difference in kind.'"

See Marchetti v. Kalish (1990), 53 Ohio St.3d 95, 100, 559 N.E.2d 699, quoting 2 Restatement of the Law 2d, Torts (1965) 587, Section 500, comment g.   Moreover, in the context of R.C. 2744.03(A)(6)(b), recklessness is a perverse disregard of a known

risk.  O'Toole v. Denihan, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, at

¶73, citations deleted.   The O'Toole court further cautioned courts not to view the

actor's conduct with "20-20 hindsight," but instead should focus on "the information and

circumstances the actor had before him at the time he chose to act."   See Marchant v.

Gouge, Richland App. No. 2009-CA-0143, 2010-Ohio-2273, at ¶37, explaining O'Toole.

 The determination of whether conduct constitutes recklessness ordinarily rests within

the jury's province.  O'Toole at ¶75.   When, however, the actor's conduct "does not

demonstrate a disposition to perversity," summary judgment may be appropriate.   Id.

{¶ 65} In the case sub judice, appellees do not argue that the city acted

maliciously, in bad faith, or wantonly.   Instead, they assert that the city recklessly

operated the sewer system. However, we believe that appellees have failed to set forth

any evidence to show that the city perversely disregarded a known risk when operating

the sewer system.   Appellees have not produced any evidence to show that the city

knew that its raising or lowering of the weir gates to prevent a CSO caused appellees'

sewage intrusions.   Moreover, even if such evidence existed, it would not be sufficient

to show a perverse disregard.   Rather, even if the city knew of a correlation between

the raising or lowering of the weir gates and the sewage intrusions, its disregard of the

sewage intrusions was to prevent untreated wastewater to flow into the Ohio River.

Because this decision was a considered choice between two alternatives and involved

a weighing of the relative risks, the city's decision cannot be considered perverse.

{¶ 66} Understandably, appellees are very angry and frustrated that the city has

not alleviated the flooding on their properties.   However, the statutory immunity

provisions constrain us to conclude that appellees cannot seek relief through a

negligence action against the city to, in essence, compel it to redesign or reconstruct the sewer system. Appellees may have established that an exception to immunity exists, but the city demonstrated that it is nevertheless entitled to invoke the discretionary defense. The city's operation of the wastewater treatment plant and the entire sewer system to prevent the spilling of untreated sewage into the Ohio River is a discretionary decision. Furthermore, appellees have not offered any evidence that the city exercised its decision with malice, in bad faith, or in a wanton or reckless manner. If we agreed with appellees that the city is not entitled to discretionary immunity with respect to its operation of the weir gates, we would, in effect, dictate the city's policy regarding the control of its sewage water and requiring the city to allow the untreated sewage to flow into the Ohio River rather than storing it in the sewer system until it can be treated. As an appellate court, we do not believe that it is the judiciary's duty or place to dictate a city's policy regarding the operation of its sewer system in order to prevent the pollution of a navigable watercourse. If landowners within the city seek a system redesign or reconstruction, they must persuade city officials to consider their views and, if appropriate, devote sufficient resources to achieve that goal.

{¶ 67} Accordingly, based upon the foregoing reasons, we hereby reverse the trial court's judgment and instruct the trial court to enter judgment for appellant on the basis of statutory immunity consistent with the foregoing opinion and decision.

JUDGMENT REVERSED AND CAUSE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.[1]

---

[1]Although the dissent suggests that the principal opinion's interpretation of the term "maintenance" is incorrect, we believe that the dissent's view extends the meaning

Kline, J., dissenting, in part, and concurring in judgment only, in part.

{¶ 68} I respectfully dissent as to the negligent-maintenance claim and concur in judgment only as to the negligent-operation claim.

Negligent-Maintenance Claim

{¶ 69} I respectfully dissent as to whether the City of Portsmouth is entitled to immunity on the appellees' negligent-maintenance claim. Here, I agree with the First Appellate District's reasoning in *Hafner*. As such, I find the following definition of "maintenance"

---

of that term too far. The dissent, in essence, equates "maintenance" with suitability and proposes that if the sewers are no longer adequate or suitable, then the city has failed to maintain them. The dissent argues that "'maintenance' means 'the labor of keeping the sewer system suitable (1) to perform the tasks of a sewer system and/or (2) to fulfill the purpose of a sewer system.'" The dissent reaches this conclusion after employing the following definition of "maintenance:" "the labor of keeping something (as buildings or equipment) in a state of repair or efficiency[.]" The dissent then looks to the definition of "efficiency," which it defines as "suitability for a task or purpose." The dissent then suggests that the city's sewer system is not suitable for the task or the purpose of sewer system. In our view, however, even if we agree that the sewer system may arguably no longer meet the needs of its residents, the authorities cited in the principal opinion conclude that this type of situation should not be equated to a failure to maintain issue. Rather, a failure to maintain claim in the statutory immunity context involves a ministerial duty. In the case at bar, the property owners essentially request the city to redesign the system and a system redesign is not a ministerial function.

We also recognize that, understandably, the aggrieved landowners involved in this action may not either appreciate or be concerned with what they may perceive as subtle nuances involved in this area of the law. Here, the landowners, through no fault of their own, have suffered for years with the recurring problem. However, our decision is based upon our understanding of Ohio case law, including Ohio Supreme Court decisions, decisions from sister Ohio appellate districts and from our appellate district. We hasten to add that we welcome further scrutiny in this matter and we encourage the Ohio Supreme Court to further clarify this important area of the law.

to be more appropriate: " the labor of keeping something (as buildings or equipment) in a state of repair or efficiency[.]" Webster' s Third New International Dictionary, Unabridged (2002). Furthermore, " efficiency" may be defined as " suitability for a task or purpose[.]" Id. Thus, in the present case, I believe " maintenance" means " the labor of keeping the sewer system suitable (1) to perform the tasks of a sewer system and/or (2) to fulfill the purpose of a sewer system." Based on these definitions, I believe that the appellees' claim implicates a proprietary function, not a governmental function. Because the city has allowed further development without upgrading the sewer system, the appellees' essentially claim that the city has failed to keep the sewer system suitable. Accordingly, I believe that the " failure-to-upgrade" claim involves the maintenance of the sewer system, and I would find that R.C. 2744.02(B)(2) applies.

{¶ 70} Regarding the third tier of immunity analysis, I would find that R.C. 2744.03(A)(5) does not apply to the appellees' negligent-maintenance claim. In *Malone v. Chillicothe*, Ross App. No. 05CA2869, 2006-Ohio-3268, we held that, " [b]ecause the proper maintenance of a sewer is not a discretionary act, R.C. 2744.03(A)(5) does not provide * * * an immunity defense." Id. at ¶¶1. Here, the city has chosen to implement a sewer system. As such, the city must perform proper maintenance related to the sewer system – or, in other words, the city must keep the sewer system suitable. The

failure to do so is not discretionary in nature.   See id. at ¶¶27.

{¶ 71} Accordingly, I respectfully dissent, in part, and would find that the City of Portsmouth is not entitled to immunity on the appellees' negligent-maintenance claim.

Negligent-Operation Claim

{¶ 72} I respectfully concur in judgment only as to the appellees' negligent-operation claim.   Here, I would not rely on cases such as *Enghauser* or *Butler*.   The Supreme Court of Ohio decided *Enghauser* before the enactment of R.C. Chapter 2744, and Justice Cook's concurring opinion in *Butler* discusses the common-law history of political subdivision immunity.   Therefore, I believe that, as cited, *Enghauser* and *Butler* are inapplicable to the present case.   Nevertheless, I agree that R.C. 2744.03(A)(5) applies to the appellees' negligent-operation claim.

{¶ 73} Accordingly, for the foregoing reasons, I respectfully dissent, in part, and concur in judgment only, in part.

JUDGMENT ENTRY

It is ordered that the judgment be reversed and cause remanded for further

proceedings consistent with this opinion.   Appellant shall recover of appellees the costs

herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the

Scioto County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule

27 of the Rules of Appellate Procedure.

*Klatt, J.: Concurs in Judgment & Opinion
Kline, J.: Concurs in Judgment Only with Opinion as to the
negligent-operation claim; Dissents with Dissenting Opinion as to the
negligent-maintenance claim

For the Court

BY:_____
Peter B. Abele, Judge

NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment
entry and the time period for further appeal commences from the date of filing with the
clerk.

*Judge William A. Klatt, of the Tenth District Court of Appeals, sitting by assignment of
the Ohio Supreme Court in the Fourth Appellate District.