[Cite as *Goebel v. Minster*, 2022-Ohio-883.]


IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
AUGLAIZE COUNTY


EDWARD GOEBEL, ET AL.,

    PLAINTIFFS-APPELLANTS,

    v.                                CASE NO.  2-21-19

VILLAGE OF MINSTER,

    DEFENDANT-APPELLEE,
    -and-
                                         O P I N I O N

HELMS & SONS EXCAVATING, INC.,

    DEFENDANT-APPELLANT.


Appeal from Auglaize County Common Pleas Court
Trial Court No. 2020-CV-52

Judgment Affirmed

Date of Decision:   March 21, 2022


APPEARANCES:

    *Jonathon N. Bond, Sean Alto and Jeffrey Kenney*
            for Appellants Goebel

    *James D. Utrecht* for Appellant Helms & Sons Excavating, Inc.

    *Jared A. Wagner* for Appellee, Village of Minster

**SHAW, J.**

{¶1} Plaintiffs-appellants, Edward and Lisa Goebel, et al. (collectively, "landowners"), and defendants-appellants, Helms & Sons Excavating, Inc. ("Helms"), bring this appeal from the September 8, 2021 judgment of the Auglaize County Common Pleas Court granting summary judgment in favor of defendant-appellee, Village of Minster ("Minster"), on the grounds of sovereign immunity. On appeal, landowners and Helms both contend that Minster was not entitled to sovereign immunity.

*Background*

{¶2} In early 2019, Minster solicited bids from contractors for the "Northeast Sanitary Sewer Improvements" project, which called for the "reconstruction of Second Street, including the installation of storm sewer modifications, water main, sanitary sewer, service laterals, sidewalks, and curb and gutter. Also installation of sanitary sewer down a portion of Garfield and Third Street." (Harrod Depo. Ex. H).

{¶3} The project had been contemplated as early as 2015-2016 because Minster was "having some storm water problems backed up into some people's homes along South Lincoln Street in the village" and because the village was "anticipating two new subdivisions coming in * * * on the northeast quarter of [Minster]." (Harrod Depo. at 9). Helms reviewed the blueprints for the project,

which had been produced by Choice One Engineering, submitted the lowest bid, and was awarded the contract.

{¶4} After Helms commenced work on the project, problems began to arise. First, soil conditions were poorer than expected in certain areas. Second, it was discovered that the blueprints for the proposed work were not entirely accurate.[1] Upon digging a trench, Helms discovered that the old sewer line was too close to the storm line to fit the new construction between them, which was what the project originally called for. Helms and a representative from Minster discussed the issue and determined that instead of running the new sanitary line *between* the old lines as the project originally called for, the new sanitary line would be placed *over* the old line, replacing the old line as the new line was placed. With this change agreed upon, work continued.

{¶5} The next problem occurred on May 16, 2019, as Helms proceeded to the removal of a buried, circular concrete structure also known as a "manhole" or a "wet well."[2] The project called for the removal of the manhole, which, at the time of excavation, was sealed and not in use. The manhole had been put in place sometime around 1994 when Minster's older "lift station" was renovated. During

---

[1] Shane Helms, the founder, owner, and president of Helms, testified that when dealing with old sanitary lines that are over twenty feet deep, "the best [blue]prints in the world, if you get them 60 percent correct, you're doing really good." (S. Helms Depo. at 12).
[2] According to testimony, the structure was a "wet well" when in use, but since there was no pump inside of it, the structure was a "manhole." We will refer to the structure as a "manhole," but any other references to "structure" or "wet well" in testimony excerpts are regarding the same manhole.

the renovation, the manhole had a pump inside of it and it redirected water flow. Once renovation on the lift station was complete, the pump inside the manhole was removed. However, the manhole itself was sealed and left in the ground.

{¶6} Helms began excavating the manhole by removing the top of the structure. With the top of the manhole removed, Helms found two pipes, or "lines," leading into the manhole. Some testimony indicated that the second line, or pipe, going into the manhole was unexpected while other testimony intimated that the parties were aware of its presence before the top of the manhole was removed.[3] Regardless, upon uncovering the second line in the manhole, Helms asked Minster's representative if the second line was "live," i.e. pressurized, and what should be done with the line.

{¶7} Minster's representative believed that the line was abandoned—it was capped inside the manhole. All individuals who testified on the issue indicated that they believed the line was abandoned based on Minster's representations. Acting under the belief that the line was not pressurized and that it was, in fact, abandoned, Minster instructed Helms to continue its excavation by cutting the second line in the manhole back several feet, and capping it.[4]

---

[3] While this fact may be disputed, it is not material to the outcome of this case.
[4] All testimony indicated that while Minster instructed Helms in what to do, it did not control *how* Helms conducted its work.

{¶8} As soon as Helms excavated into the line in question, sewage and water "erupted" from the line, surprising everyone on site. (Nichols Depo. at 72). "Sewage was blowing everywhere and you c[ouldn't] stop it. [The line] should have been dead." (Snyder Depo. at 44).

{¶9} A GIS technician for Minster was on site daily during the project and he was present when the sewage was shooting out of the second line into the manhole and the trench. A separate Minster employee was dispatched to the "lift station" to find the valve that stopped the water flow through the line that was previously thought to be abandoned. Within thirty minutes the line was shut down. After the line was shut down, it was cut back and capped by Helms.

{¶10} Meanwhile, Minster hired a company with a vacuum truck to come in and clean out the excavated trench and manhole that had been filled with sewage, concrete, and rubble due to the eruption from the pipe. Notably, the eruption from the pipe "removed earth and stone material[,] * * * [and] undermined the storm sewer * * * by taking all the earth away from it and then the stone from around the bottom of it and the side of it to where it was exposed[.] * * * [Helms] c[ould] see that line now." (Nichols Depo. at 72).

{¶11} Throughout the evening of May 16, 2019, the individual with the vacuum truck and some Helms employees removed debris from the trench/manhole area. Helms employees on site indicated that the individual using the vacuum truck

could not do the job alone. Helms' employees assisted the individual with the vacuum truck because it "was just the right thing to do to stay and make sure it got cleaned out." (Musgrave Depo. at 49). When they were finished, "[t]he wet well and all the gravel was cleaned up and [the system] was flowing like it should be." (Langenkamp Depo. at 65). Stated differently, they "cleaned everything up, everything was running perfectly fine. The SCADA reports all showed that the [lift station] pumps were running at normal at that point * * * prior to any of the house basement issues." (Meyer Depo. at 26-27).

{¶12} It was sprinkling rain around 11:30 p.m. when the Helms employees finished at the site for the night. The forecast called for rain but Helms' employees were not overly concerned about it because "there was no talk of 5 inches of rain in like three hours." (Musgrave Depo. at 42). Before they left the site, Helms employees had cleared the area so there was an open flowing trench and they sealed the area off so people could not get in. A trench box and steel plates were employed to protect the trench itself.

{¶13} Through all of these issues, including the severed line that was thought to be abandoned and the filling of the trench/manhole, there was no indication that *any* of the landowners' homes were flooded.

{¶14} During the early morning hours of May 17, 2019, in the hours after the trench had been cleared, five or more inches of rain fell in the Minster area. The

Superintendent of Minster's wastewater treatment plant said that all four pumps were running at the lift station, which he had never seen before. The rain caused the water in the Miami and Erie canal to rise to the top of the banks, which then backed water into the storm sewer because the storm sewer emptied into the canal. Testimony indicated that the storm sewer line was in poor condition, rotted and rusted, which was part of the reason it was being replaced. The storm sewer was also partially exposed when Helms was excavating. The overloaded storm line "collapsed," causing water to flow into the open manhole. Minster's lift station could not handle all of the water going into the sewer system, leading to flooding in the landowners' homes.

{¶15} A Minster employee was called at approximately 3:30 a.m. on May 17, 2019, and notified that an inch or two of water was in a landowner's basement. He indicated he had seen flooding in basements before but never on Second Street. The Minster employee went to the construction site and found the manhole completely full of water.

{¶16} One of Helms' employees was back at the trench by 7:00 a.m. on May 17, 2019. To help remedy the flooding/water backup situation, a metal plate was placed in front of the canal to block the flow of additional water into Minster's storm sewer. Once the plate was in place, the pumps at the lift station were able to remove the excess water and the flooding receded in approximately 45 minutes.

Landowners would claim that sewage and water flooded their homes causing substantial damage to both real and personal property.

{¶17} On April 15, 2020, landowners filed a complaint against Minster and Helms alleging negligence in the destruction of a sewer system pursuant to R.C. 2744.01(G)(2)(d), and breach of contract to a third-party beneficiary.

{¶18} Helms filed an answer on May 1, 2020, denying negligence, and asserting that appellees were not third-party beneficiaries and had no privity of contract in this matter.

{¶19} On May 8, 2020, Minster filed a Civ.R. 12(B)(6) motion to dismiss the complaint filed by appellees arguing that Minster was entitled to sovereign immunity. Further, Minster argued that landowners had no grounds to attempt to enforce the contract between Minster and Helms. The landowners opposed Minster's motion.

{¶20} On June 3, 2020, the trial court filed an entry denying Minster's motion to dismiss the negligence claim on sovereign immunity grounds at such an early stage of the litigation; however, Minster's motion to dismiss with regard to the breach of contract claim was granted.

{¶21} Minster appealed the denial of its motion to dismiss the negligence claim on sovereign immunity grounds to this Court in *Goebel v. Minster*, 3d Dist. Auglaize No. 2-20-14, 2020-Ohio-5467. Ultimately we affirmed the trial court's

denial of Minster's motion to dismiss, noting that at this very early stage of the proceeding we were unable to find *beyond doubt* that landowners could prove no set of facts entitling them to recovery; however, we noted that immunity could still be established later in a summary judgment proceeding *if* the undisputed facts warranted such a finding. *Goebel* at ¶ 32.

{¶22} With the case returned to the trial court, on December 18, 2020, Minster filed an answer to landowners' complaint asserting, *inter alia*, the defense of sovereign immunity. Minster also filed a cross-claim against Helms asserting, *inter alia*, a claim for breach of contract.

{¶23} On December 28, 2020, Helms filed an answer to Minster's cross-claim and filed its own cross-claim against Minster. Minster subsequently filed an answer to Helms' cross-claim.[5]

{¶24} Discovery proceeded with interrogatories being served and answered and numerous depositions being taken and filed with the trial court.

{¶25} On July 12, 2021, Minster filed a motion for summary judgment asserting sovereign immunity. Minster argued that it was entitled to immunity, that the parties had not established an exception to immunity, and that even if the parties

---

[5] On May 25, 2021, Frankenmuth Mutual Insurance Company moved to consolidate trial court case 2021 CV 0047 with the instant case, arguing that Frankenmuth had filed a subrogation complaint against Helms regarding water loss from the reconstruction project and that the cases should be consolidated. The cases were consolidated by entry dated May 27, 2021. Frankenmuth's complaint and subsequent filings by the parties related to Frankenmuth's case against Helms were filed in the record; however, Frankenmuth's case against Helms has little relevance to the matter *sub judice*, so we will not further address that action.

did establish an exception, Minster would be able to reinstate its immunity under R.C. 2744.03(A)(5) as there was no evidence that its employees acted in bad faith, wantonly, maliciously, or recklessly.

{¶26} On August 9, 2021, Helms filed a memorandum in opposition to Minster's summary judgment motion claiming that Minster was negligent in maintaining its sewer system in several respects *unrelated* to the construction project such that it constituted negligence in the performance of a proprietary function. Further, Helms argued that Minster specifically directed it to excavate the "abandoned" line.

{¶27} On August 20, 2021, landowners filed their memorandum in opposition to Minster's summary judgment motion arguing that Minster negligently performed a proprietary function and did not have statutory immunity, that Minster's negligence contributed to the flooding of the landowners' homes, and that Minster was not entitled to have immunity reinstated.

{¶28} On September 7, 2021, Minster filed a reply in support of its summary judgment.

{¶29} On September 8, 2021, the trial court filed a judgment entry granting Minster's motion for summary judgment. The trial court determined that "the errors and omissions [by Minster] * * * were partially governmental and partially

proprietary functions as defined within R.C. 2744.01(C)(2)((l) and R.C. 2744.01(G)(2)(d)[.]" (Doc. No. 99). The trial court then determined as follows:

> **2.** **[Minster] is entitled to the general immunity as set forth in R.C. 2744.02(A)(2);**
>
> **3.** **the performance by [Minster] of a proprietary function is within the exception to the general grant of immunity in accordance with R.C. 2744.02(B)(2);**
>
> **4.** **The performance by [Minster] of a governmental function is within the exception to the general grant of immunity in accordance with R.C. 2744.02(B)(4) if caused by the negligence of their employees and that occurs within or on the grounds of, and is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function;**
>
> **5.** **there was no physical defects within or on the grounds of any building being used in connection with the performance of a governmental function, and therefore, the exception in R.C. 2744.02(B)(4) is inapplicable;**
>
> **6.** **[Minster] may avail itself of the defense of immunity pursuant to R.C. 2744.03(A)(5)[.]** * * *[6]
>
> **7.** **There is no evidence of malicious purpose, bad faith, wantonness or recklessness** [establishing Minster's defense to an immunity exception pursuant to R.C. 2744.03(A)(5)];
>
> **8.** **when construed most strongly in favor of [landowners] and cross-claimant Helms, the facts do not support any genuine issue of material fact whether [Minster] is immune in this instance.**

---

[6] The trial court quotes the language of R.C. 2744.03(A)(5), which we cite *infra* at ¶ 50.

(Doc. No. 99). The trial court thus determined that there were no genuine issues of material fact, that reasonable minds could come to but one conclusion, and that conclusion was adverse to the non-moving parties. The trial court granted Minster's summary judgment motion, dismissed landowners' complaint and Helms' cross-claim against Minster on the basis of immunity.

{¶30} The landowners brought the instant appeal from the trial court's judgment, asserting the following assignment of error for our review.

**Landowners' Assignment of Error**
**The trial court erred by granting the Village of Minster's motion for summary judgment holding that the Village enjoyed statutory immunity under R.C. 2744 *et seq*.**

{¶31} Helms also appealed the trial court's judgment and asserted the following assignments of error for our review.

**Helms' First Assignment of Error**
**It was error for the trial court to grant summary judgment when the cause of the sewage overflowing the trench was negligence in the performance of a proprietary function, to wit:  operation repair and maintenance of a sewer system.**

**Helms' Second Assignment of Error**
**It was error for the trial court to grant summary judgment when the Village employees were directing and controlling the work of the excavation contractor, Helms and Sons, Inc.'s direction and control which places the case in an exception to governmental immunity.**

{¶32} As all of the assignments of error challenge the trial court's determination with regard to Minster's summary judgment motion, we will address the assignments of error together.

*Landowners' Assignment of Error and Helms' Assignments of Error*

{¶33} On appeal, the landowners and Helms both argue that the trial court erred by determining that Minster was entitled to sovereign immunity in this matter.

Standard of Review

{¶34} "Whether a party is entitled to immunity is a question of law properly determined by the court prior to trial pursuant to a motion for summary judgment." *Pelletier v. Campbell*, 153 Ohio St.3d 611, 2018-Ohio-2121, ¶ 12, citing *Conley v. Shearer*, 64 Ohio St.3d 284, 292 (1992).

{¶35} We review a decision to grant a summary judgment motion on the basis of sovereign immunity de novo. *See Pelletier* at ¶ 13; *Smith v. McBride*, 130 Ohio St.3d 51, 2011-Ohio-4674, ¶ 12. "De novo review is independent and without deference to the trial court's determination." *ISHA*, *Inc. v. Risser*, 3d Dist. Allen No. 1-12-47, 2013-Ohio-2149, ¶ 25.

{¶36} Summary judgment is proper where there is no genuine issue of material fact, the moving party is entitled to judgment as a matter of law, and reasonable minds can reach but one conclusion when viewing the evidence in favor of the non-moving party, and the conclusion is adverse to the non-moving party.

Civ.R. 56(C); *State ex rel. Whittaker v. Lucas County Prosecutor's Office*, 164 Ohio St.3d 151, 2021-Ohio-1241, ¶ 8. Material facts are those facts " 'that might affect the outcome of the suit under the governing law.' " *Turner v. Turner*, 67 Ohio St.3d 337, 340 (1993), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). "Whether a genuine issue exists is answered by the following inquiry: [d]oes the evidence present 'a sufficient disagreement to require submission to a jury' or is it 'so one-sided that one party must prevail as a matter of law[?]' " *Id.* quoting *Anderson* at 251-252.

{¶37} "The party moving for summary judgment has the initial burden of producing some evidence which demonstrates the lack of a genuine issue of material fact." *Carnes v. Siferd*, 3d Dist. Allen No. 1-10-88, 2011-Ohio-4467, ¶ 13, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 282 (1996). "In doing so, the moving party is not required to produce any affirmative evidence, but must identify those portions of the record which affirmatively support his argument." *Id.*, citing *Dresher* at 292. "The nonmoving party must then rebut with specific facts showing the existence of a genuine triable issue; he may not rest on the mere allegations or denials of his pleadings." *Id.* citing *Dresher* at 292.

Sovereign Immunity Framework

{¶38} Ohio's Political Subdivision Tort Liability Act, which governs political subdivision liability and immunity, is codified in Chapter 2744 of the

Revised Code. *McConnell v. Dudley*, 158 Ohio St.3d 388, 2019-Ohio-4740, ¶ 20. "Determining whether a political subdivision is immune from tort liability pursuant to R.C. Chapter 2744 involves a familiar, three-tiered analysis." *Pelletier*, 153 Ohio St.3d 611, 2018-Ohio-2121, ¶ 15.

{¶39} The first tier of the sovereign-immunity analysis generally establishes that "a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." R.C. 2744.02(A)(1). However, that immunity is not absolute. *See* R.C. 2744.02(B); *McConnell* at ¶ 21.

{¶40} In the second tier of the analysis, we consider the potential applicability of any of the five exceptions to immunity listed in R.C. 2744.02(B)(1)-(5), which would lift the immunity from the political subdivision. *Id*. at ¶ 22.

{¶41} Finally, if any of the exceptions to political subdivision immunity in R.C. 2744.02(B)(1)-(5) are applicable to remove immunity from the political subdivision, then we move to the third tier of the analysis and consider whether immunity can be restored to the political subdivision based on the defenses enumerated in R.C. 2744.03.

Analysis

**{¶42}** There is no dispute in this case that Minster is a political subdivision generally entitled to immunity under R.C. 2744.02(A)(1).

**{¶43}** With immunity generally established, and the first tier of the immunity analysis completed, we turn to the second tier of the analysis to determine whether any of the exceptions to immunity listed in R.C. 2744.02(B)(1)-(5) are applicable in this case. Generally, landowners argue that the exception codified in R.C. 2744.02(B)(2) is applicable to strip immunity from Minster, while Helms argues that the exception in R.C. 2744.02(B)(4) is applicable to strip immunity from Minster. These provisions read as follows.

**(B) Subject to sections 2744.03 and 2744.05 of the Revised Code, a political subdivision is liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by an act or omission of the political subdivision or of any of its employees in connection with a governmental or proprietary function, as follows:**

**\* \* \***

**(2) Except as otherwise provided in sections 3314.07 and 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions.**

**\* \* \***

**(4) Except as otherwise provided in section 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property that is caused by the negligence of**

**their employees and that occurs within or on the grounds of, and is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function, including, but not limited to, office buildings and courthouses, but not including jails, places of juvenile detention, workhouses, or any other detention facility, as defined in section 2921.01 of the Revised Code.**

R.C. 2744.02(B)(2), (4).

**{¶44}** We will deal with the applicability of each potential exception in turn, beginning with R.C. 2744.02(B)(2). Importantly, the exception in (B)(2) is limited to acts of employees with respect to "proprietary functions." The exception does not include acts with respect to "governmental functions." Both "governmental" and "proprietary" functions are defined in R.C. 2744.01.

**(C)(1) "Governmental function" means a function of a political subdivision that is specified in division (C)(2) of this section or that satisfies any of the following:**

**(a)   A function that is imposed upon the state as an obligation of sovereignty and that is performed by a political subdivision voluntarily or pursuant to legislative requirement;**

**(b)   A function that is for the common good of all citizens of the state;**

**(c)   A function that promotes or preserves the public peace, health, safety, or welfare; that involves activities that are not engaged in or not customarily engaged in by nongovernmental persons; and that is not specified in division (G)(2) of this section as a proprietary function.**

**(2)   A "governmental function" includes, but is not limited to, the following:**

Case No. 2-21-19

**\* \* \***

**(e) The regulation of the use of, and the maintenance and repair of, roads, highways, streets, avenues, alleys, sidewalks, bridges, aqueducts, viaducts, and public grounds;**

**\* \* \***

**(l) The provision or nonprovision, planning or design, construction, or reconstruction of a public improvement, including, but not limited to, a sewer system**[.]

R.C. 2744.01(C).

By contrast,

**(G)(1) "Proprietary function" means a function of a political subdivision that is specified in division (G)(2) of this section or that satisfies both of the following:**

**(a) The function is not one described in division (C)(1)(a) or (b) of this section and is not one specified in division (C)(2) of this section;**

**(b) The function is one that promotes or preserves the public peace, health, safety, or welfare and that involves activities that are customarily engaged in by nongovernmental persons.**

**(2) A "proprietary function" includes, but is not limited to, the following:**

**\* \* \***

**(d) The maintenance, destruction, operation, and upkeep of a sewer system**[.]

R.C. 2744.01(G).

-18-

{¶45} In this case, the parties disagree as to whether a "governmental" or "proprietary" function was being performed. Landowners and Helms maintain that Minster's employees were negligent in the maintenance, destruction, operation, and upkeep of its sewer system in this matter, making its actions proprietary functions. R.C. 2744.01(G). More specifically, they contend that Minster mistakenly left the "abandoned" sewer line open, that Minster negligently instructed Helms to "destroy" the line that was thought to be abandoned without checking it for pressure first, and that Minster permitted a sloppy cleanup after the pipe erupted, which led to flooding.

{¶46} By contrast, Minster contends that it was performing a function specifically defined as "governmental," namely the "construction, or reconstruction of a public improvement, including, but not limited to, a sewer system." R.C. 2744.01(C)(2)(1). Further, Minster argues that pursuant to the plain, unambiguous language of R.C. 2744.01 itself, an action *cannot* be proprietary if it has already been defined as governmental. R.C. 2744.01(G)(1)(a); *Bucey v. Carlisle*, 1st Dist. Hamilton No. C-090252, 2010-Ohio-2262, ¶ 14 ("Where a function is specifically defined as a governmental function, it cannot be a proprietary function."). The terms proprietary and governmental have been described as "mutually exclusive." *DSS Services, LLC v. Eitel's Towing, LLC*, 10th Dist. Franklin No. 18AP-567, 2019-Ohio-3158, ¶ 15.

{¶47} In assessing whether Minster was performing a governmental or proprietary function, we emphasize that under the plain, unambiguous language of R.C. 2744.01(C)(2)(l), the *reconstruction* of a sewer system would be a governmental function. Furthermore, there is case authority that would support the proposition that Minster was engaged in a governmental function in this case by reconstructing the sewer.

> **"Municipal decisions regarding updating or upgrading, rather than simple maintenance and repair of existing systems have been held to be a governmental function to which immunity applies."** *Matter v. Athens*, **4th Dist. No. 13CA20, 21 N.E.3d 595, 2014-Ohio-4451, ¶ 22, citing** *Essman v. Portsmouth*, **4th Dist. No. 09CA3325, 2010-Ohio-4837, ¶ 46. "[A] political subdivision's decision regarding an upgrade of its sewer system [or water supply system] is a governmental function. A decision to upgrade requires a political subdivision to weigh various considerations, including the availability of fiscal resources, the use and acquisition of additional equipment, and the overall design of the system."** *Essman* **at ¶ 44.** *See also Smith v. Stormwater Mgt. Div.*, **111 Ohio App.3d 502, 507, 676 N.E.2d 609 (1st Dist.1996). Since "upgrading involves construction and design, such upgrading is a governmental, not a proprietary, function."** *Coleman v. Portage Cty. Engineer,* **133 Ohio St.3d 28, 2012-Ohio-3881, ¶ 1, 975 N.E.2d 952.**

*Glover v. City of Columbus*, 10th Dist. Franklin No. 17AP-332, 2018-Ohio-4743, ¶ 18. Based on both statutory language and case authority, the cutting back and

capping of the line in question and the resulting cleanup were both part of sewer reconstruction and thus would be governmental functions.[7]

{¶48} If landowners' and Helms were only arguing about actions that occurred during the sewer reconstruction project, we could end the second tier analysis here. However, landowners also argue that Minster was negligent by leaving the "abandoned" line pressurized, which they contend would constitute negligent operation/maintenance/upkeep even if the other issues did not, making it a proprietary function.[8]

{¶49} Importantly, even if we accepted landowners' arguments and determined that the negligence alleged by leaving the valve open to the "abandoned" line was in relation to a proprietary function,[9] thus removing the cloak of immunity, Minster could still restore immunity in this matter through the defenses listed in R.C. 2744.03(A)(5).

{¶50} In fact, to the extent that the trial court evidently determined that the functions in this matter were partly proprietary, the trial court explicitly determined

_____

[7] Moreover, to find that Minster was engaging in a proprietary function rather than a governmental function regarding the sewer lines, we would have to determine that cutting back and capping a single line amounted to the "destruction" of a sewer system within the proprietary function definition.

[8] In its entry on the matter, the trial court found that Minster was engaged in actions that were "partially governmental" and "partially proprietary." (Doc. No. 99). Notably, the trial court did not specify how it reached this conclusion in parsing out governmental and proprietary functions, or what actions it determined were governmental versus proprietary.

[9] To make this determination, we would have to divorce the fact that even though the line was "open" and it should not have been, it was not improperly functioning and a problem was only caused when it was cut open as part of the reconstruction project.

that Minster's immunity was restored under R.C. 2744.03(A)(5), which reads as follows.

> **(A)  In a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish nonliability:**
>
> **\* \* \***
>
> **(5)  The political subdivision is immune from liability if the injury, death, or loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner.**

{¶51} Landowners argue that R.C. 2744.03(A)(5) should not apply in this matter because there was no evidence presented as to how there was an exercise of judgment or discretion regarding the use of equipment.   Further, landowners contend that immunity under R.C. 2744.03(A)(5) "attaches only to the broad type of discretion involving public policy made with 'the creative exercise of political judgment.' " *McVey v. Cincinnati*, 109 Ohio App.3d 159, 163, 671 N.E.2d 1288, 1290 (1st Dist.1995), quoting *Bolding v. Dublin Local School Dist.*, 10th Dist. Franklin No. 94APE09-1307, 1995 WL 360227.  "Immunity does not apply to the negligence of employees in 'the details of carrying out the activity even though there is discretion in making choices.' " *Id*. quoting *Id.*

{¶52} We disagree with landowners' argument and agree with the trial court that R.C. 2744.03(A)(5) does apply here and would restore immunity. Any injuries did occur during the exercise of discretion and the use of equipment in this matter. Further, there is no indication that any of the actions were done with a malicious purpose, in bad faith, or in a wanton or reckless manner. The lowest of these standards, reckless, has been defined as "the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, at paragraph 4 of syllabus. Here, there is no showing of anything greater than negligence.

{¶53} For these reasons, even if we assumed that this matter involved a proprietary function invoking an exception to immunity in the second tier of the sovereign immunity analysis pursuant to R.C. 2744.02(B)(2), Minster's immunity would be restored under R.C. 2744.03(A)(5). Thus landowners' arguments to the contrary are not well-taken, and their assignment of error is overruled.[10]

{¶54} Next, we turn to Helms' claim that the immunity exception under R.C. 2744.02(B)(4) is applicable in this case. The trial court specifically rejected this assertion in its judgment entry, finding that there were no physical defects within or

---

[10] To the extent that any of Helms' arguments overlap regarding this immunity exception, those arguments are rejected as well.

on the grounds of any building being used in the performance of a governmental function, thus the exception was inapplicable.

{¶55} We agree with the trial court. There is no evidence that there was a defect on government grounds or in a government building in this matter to invoke R.C. 2744.02(B)(4). Even assuming that it was a Minster employee that left the valve open to the line that was thought to be "abandoned," this was not a "defect" to the "building" or "grounds." Thus Helms' arguments are not well-taken, and their assignments of error are overruled.

{¶56} In sum, after a de novo review, we find that Minster was entitled to summary judgment in this matter on the grounds of sovereign immunity. Therefore, the assignments of error asserted by the landowners and Helms are overruled.

*Conclusion*

{¶57} For the foregoing reasons the landowners' assignment of error and Helms' assignments of error are overruled and the judgment of the Auglaize County Common Pleas Court is affirmed.

*Judgment Affirmed*

**MILLER and WILLAMOWSKI, J.J., concur.**

**/jlr**