[Cite as *Dalton v. Hubbard*, 2026-Ohio-1101.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF WAYNE | ) | |

VILLAGE OF DALTON

    Appellant

    v.

RICHARD E. HUBBARD, JR.,
EXECUTOR OF THE ESTATE OF JANET
HUBBARD

    Appellee

C.A. No.    25AP0032

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF WAYNE, OHIO
CASE No.    2023-CVC-H-0368

DECISION AND JOURNAL ENTRY

Dated: March 30, 2026

---

STEVENSON, Judge.

{¶1}    Defendant-Appellant, Village of Dalton ("Village") appeals from the judgment of the Wayne County Court of Common Pleas denying its motion for summary judgment. For the reasons set forth below, this Court reverses in part, and remands in part.

I.

{¶2}    This matter concerns the real property located at 160 N. Church Street, Dalton, Ohio 44618 (the "Hubbard Property") that was purchased by Janet Hubbard ("Janet") in 1968. Janet passed away in December 2022. Plaintiff-Appellee, Richard E. Hubbard, Jr., Executor of Janet's Estate ("Hubbard"), is Janet's son.

{¶3}    A naturally occurring stream runs through the northern (back) portion of the Hubbard Property. The stream originates west of the Village boundary line and runs parallel to N. Church Street. Hubbard recalls that the stream existed at the time Janet purchased the Hubbard

Property. Sometime prior to 1970, a culvert was installed to allow the stream to flow below N. Church Street.

{¶4} In the 1970's and 1980's, subdivisions were constructed west of the Hubbard Property - Woodridge Estates, the N. Church Street Development, and Tionesta Estates. That construction took place prior to the enactment of stormwater management regulations mandated by the EPA nationally in 2003 as part of the Federal Clean Water Act. The stormwater generated from these developments was discharged into the culvert and directed to the pre-existing stream where it then passed below N. Church Street and flowed behind the Hubbard Property.

{¶5} In 2003 Janet and Hubbard noticed erosion on the Hubbard Property. They attributed it to the increasing stormwater discharge into the stream from the addition of homes to the subdivisions west of N. Church Street. Janet complained to the Village Council which resulted in newspaper coverage. According to the news article, she complained of gushes of water after a hard rain, and that while she used to mow a strip of grass between her house and the stream, by 2003 that strip was gone.

{¶6} Both Janet and Hubbard attended Village Council meetings to discuss the erosion issue. As the stream was naturally occurring and was not created by the Village or the developers, the Village did not have an easement for the affected portion of the Hubbard Property. Nonetheless, as a gesture of good faith, the Village consulted with Engineering Associates ("EA") and requested an assessment of the culvert and stream even though the Village did not believe it had a duty to do anything. EA recommended two potential courses of action that it outlined in a letter. The first was to armor the banks of the stream with rock channel protection approximately three feet above the channel for 100 linear feet downstream. According to EA, this would realign the channel, retard the eventual erosion, and could be done by the Village at a cost of

approximately $8,000. The second proposed solution was to close in the stream by extending the culvert, however it would cost approximately $135,000 which the EA did not believe was justified at that time.

{¶7} The record contains disputed facts as to what action the Village ultimately took in response to the EA's recommendations. According to the deposition testimony of Mr. David Reynolds, the Village's Road Superintendent, the Village implemented the first option exactly as recommended. Hubbard's expert, Mr. Jim Mueller of Poly Science Engineering Group, did not believe the Village followed either of the EA's recommendations. He testified that the Village only raised the height of the water exiting the culvert one to two feet, to the height of the culvert outlet, and only extended the concrete pad for 35-40 feet, which in his opinion caused further damage. Hubbard attested in an affidavit that the Village's "employees poured approximately twenty-five feet of concrete from the beginning of the culvert to the stream . . . ." Patrick Sword, President of the Village Council and owner of his own excavation company, testified at his deposition that the concrete only appeared to be twenty-five feet in length from the culvert. Although the facts are in dispute as to the length, height, and composition of the concrete pad that the Village constructed, and the parties make much of that dispute in their appellate briefs, resolution of that particular question is not determinative of the issues on appeal.

{¶8} In 2006 the Village adopted stormwater regulations. However, the Village relied upon the Ohio EPA for review and guidance regarding residential and commercial development before its engineer gave approval to a developer. The Village's regulations were not made retroactive. According to the deposition testimony of Mr. Reynolds, none of the homes built post-regulation in the western subdivisions have stormwater being directed into the stream. Instead, the stormwater drains into a retention pond. Mr. Sword also testified to that fact.

{¶9} When Janet passed away in 2022, Hubbard became the executor of her estate. According to his deposition testimony, he inspected the Hubbard Property for resale purposes and discovered for the first time substantial damage to the carport/garage area, retaining wall, trees, and back steps of the home, which he alleged was due to erosion occurring where the Village performed its work in 2003. He claims that he did not inspect the Hubbard Property after 2003 because he and Janet were told by Village representatives that the Village made a permanent fix to the erosion issues.

{¶10} After discovering the damage, Hubbard and his sibling contacted the Ohio EPA. The Ohio EPA conducted a site visit and determined that the erosion was the result of the 1980's development that was constructed before there were regulatory requirements for stormwater discharge. The EPA also stated in its findings that the stormwater from the newest phase of the development drains into a different stream. The EPA advised Hubbard to work with the Village on a stream restoration solution.

{¶11} Hubbard filed a complaint against the Village in September 2023 setting forth two causes of action: (1) negligence, and (2) inverse condemnation. Hubbard's negligence claim alleged that the Village failed to properly maintain and operate its stormwater management system and that this negligent operation and maintenance caused continual and substantial erosion and damage to the Hubbard Property. Hubbard alleged in his inverse condemnation claim that the erosion from the negligent operation of the stormwater management system constituted an unconstitutional taking that deprived him of his property rights. After the Village moved for summary judgment, Hubbard amended his complaint to include a request for a writ of mandamus regarding the takings claim. He asked that the writ direct the Village to institute an eminent domain proceeding to appropriate the Hubbard Property and pay Hubbard just compensation.

{¶12} Hubbard responded to the Village's motion for summary judgment and the Village replied. Following the court's ruling denying the Village's motion, the Village timely appealed and asserts three assignments of error for our review.

II.

### ASSIGNMENT OF ERROR NO. 1

**THE TRIAL COURT ERRED AS A MATTER OF LAW IN DETERMINING QUESTIONS OF FACT EXISTED TO PRECLUDE THE APPLICATION OF GOVERNMENTAL IMMUNITY TO BAR [HUBBARD'S] NEGLIGENCE CLAIM.**

{¶13} "An appellate court can review only final orders, and without a final order, an appellate court has no jurisdiction." *Supportive Solutions, L.L.C. v. Electronic Classroom of Tomorrow*, 2013-Ohio-2410, ¶ 10. "Generally, the denial of a motion for summary judgment is not a final, appealable order." *Mill Creek Metro. Park Dist. Bd. of Commrs. v. Less*, 2023-Ohio-2332, ¶ 11. However, pursuant to R.C. 2744.02(C), "an order denying a political subdivision the benefit of immunity is a final order that may be appealed immediately." *Riscatti v. Prime Properties Ltd. Partnership*, 2013-Ohio-4530, ¶ 18. The Ohio Supreme Court has extended the scope of R.C. 2744.02(C) "to the denial of a motion for summary judgment that is based on a claim that the political subdivision is immune under R.C. Chapter 2744[.]" *Id*. at ¶ 19. Accordingly, we have jurisdiction to review this assignment of error.

{¶14} Summary judgment is appropriate if: "(1) [n]o genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977). To succeed on a motion for summary judgment, the movant bears the initial burden

of demonstrating there are no genuine issues of material fact concerning an essential element of the opponent's case. *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996). If the movant satisfies this burden, the nonmoving party "'must set forth specific facts showing that there is a genuine issue for trial.'" *Id*. at 293, quoting Civ.R. 56(E). We review a summary judgment order de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996).

{¶15} Ohio's Political Subdivision Tort Liability Act, which governs political subdivision liability and immunity, is codified in R.C. 2744.01 et seq. and sets forth a three-tiered analysis for determining whether a political subdivision is immune from liability for injury or loss to property. *Cramer v. Auglaize Acres*, 2007-Ohio-1946, ¶ 14. "The first tier is the general rule that a political subdivision is immune from liability incurred in performing either a governmental function or proprietary function." *Id*. "However, that immunity is not absolute." *Id*. at ¶ 14.

{¶16} Under the second tier of the analysis, a political subdivision's comprehensive immunity can be abrogated if any of the five exceptions set forth at R.C. 2744.02(B) apply. *Id.* at ¶ 15. If one of those exceptions applies, R.C. 2744.02(B) also provides several full defenses a political subdivision may assert in specific instances. "'If any of the exceptions to immunity in R.C. 2744.02(B) do apply and no defense in that section protects the political subdivision from liability, then the third tier of the analysis requires a court to determine whether any of the defenses in R.C. 2744.03 apply, thereby providing the political subdivision a defense against liability.'" *Cramer* at ¶ 16, quoting *Colbert v. Cleveland*, 2003-Ohio-3319, at ¶ 7-9. Those full defenses, if proven, will result in the political subdivision retaining its cloak of immunity.

{¶17} The trial court concluded that of the enumerated exceptions to immunity, the only relevant one was R.C. 2744.02(B)(2) ("political subdivisions are liable for . . . loss to . . . property caused by the negligent performance of acts by their employees with respect to proprietary

functions of the political subdivisions"). Neither party disputes that conclusion. The court then noted the distinction between governmental and proprietary functions as applicable to this matter: that "[m]aintaining a sewer system is a proprietary function, while the construction, or design of a sewer system is typically a governmental function." In denying summary judgment, the court found as follows:

> there are genuine issues of material fact as to the specific nature, use, and control of the stream, culvert, and modifications made to the system discharging the water. Also, [the Village] engaged in a construction project along the banks of the stream in 2003, which could show ownership, control and/or maintenance of the system at issue. Therefore, the Court finds that the facts, when viewed in the light most favorable to [Hubbard], do not establish that the relevant function is a governmental function, thereby conferring immunity upon [the Village].

{¶18} The Village argues under this assignment of error that the trial court erred as a matter of law because there is no dispute of material fact that Hubbard's negligence complaint attacks a governmental function, not a proprietary function, and is therefore immune from liability. The Village contends that although Hubbard's complaint uses the terms "maintenance" and "operation" to characterize the Village's alleged negligence, the complaint actually challenges the original design and capacity of the stormwater system created when the subdivisions were built in the 1970's and 80's as well as the work undertaken by the Village in 2003 to control the increasing volume of water flowing through the stream as a result of the new home construction. In support, the Village relies on both the testimony and report of Hubbard's expert, Mr. Mueller, as well as Hubbard's affidavit and deposition testimony. For the reasons set forth below, we agree with the Village.

{¶19} R.C. 2744.01(C)(2)(l) identifies as a governmental function "[t]he provision or nonprovision, planning or design, construction, or reconstruction of a public improvement, including, but not limited to, a sewer system[.]" Conversely, R.C. 2744.01(G)(2)(d) identifies as

a proprietary function "[t]he maintenance, destruction, operation, and upkeep of a sewer system[.]"

In evaluating this distinction, the Ohio Supreme Court held as follows:

> "A complaint is properly characterized as a maintenance, operation, or upkeep issue when 'remedying the sewer problem would involve little discretion but, instead, would be a matter of routine maintenance, inspection, repair, removal of obstructions, or general repair of deterioration.' But the complaint presents a design or construction issue if 'remedying a problem would require a [political subdivision] to, in essence, redesign or reconstruct the sewer system.'"

(Internal citation omitted.) *Coleman v. Portage County Eng'r*, 2012-Ohio-3881, ¶ 30, quoting *Essman v. Portsmouth*, 2010-Ohio-4837, ¶ 32-33 (4th Dist.) and *Guenther v. Springfield Twp. Trustees*, 2012-Ohio-203, ¶ 18 (2d Dist.).

{¶20} Mr. Hubbard testified at his deposition that he believed the erosion on the Hubbard property was due primarily to "[t]he volume of water" from the growing size of the stream every year and that he had no knowledge of whether any part of the Village's stormwater management system or the culvert were in disrepair. He attributed the increased volume of water to the housing developments that were built in the 1970's and 80's. Thus, in his own words, Mr. Hubbard's complaint is not about the state of repair of the system as he had no knowledge about that. Rather, his concern was the amount of water flowing through the stream and its effect on the erosion which he alleges was made worse by the 1970's and 80's construction of housing developments.

{¶21} Hubbard's expert, Mr. Mueller, stated in his report that "[t]o date, there has been no action taken by the [Village] regarding the maintenance of the culvert or the culvert outlet." During his deposition he was cross-examined regarding that statement and what he meant by the term "maintenance" of the culvert. Mr. Mueller testified as follows on that subject:

> Q. (Village's counsel): Okay. But when you're referencing maintenance, you're talking more about designing a better system. Is that accurate?
>
> A. (Mr. Mueller): There would be some work that could be done. You have to remember one of the two suggestions that was made in 2003 by the engineering

firm was to use - - to place some very large rocks, and I'm talking stuff that's, you know, a foot-and-a-half in diameter, limestone, and lining the creek bed at that time for maybe fifty or a hundred feet to protect it and channel the water away as quickly as possible. . . .

Q. Okay. So that's what you're referring to with maintenance - -

A. Yes.

Q. -- *would be the design and construction of expanding the culvert?*

A. Yes.

(Emphasis added.)

{¶22} Similarly, Mueller's written report criticized the Village's alleged failure to comply with one of the two options proposed by EA in its 2003 recommendation letter and stated that if the Village had done so, the stream would not have caused additional erosion and damage to the Hubbard property. Mueller's opinion was that "the concrete pad and work completed by the [Village] has caused damage to [Hubbard's] property . . . ." Furthermore, in both his deposition testimony and his report he criticized the Village for not making adequate provisions for stormwater management in the 1970's and 80's when the subdivisions were first constructed, faulting specifically the Village's failure to install a detention pond to accommodate an influx in the volume of water. In addition, Mueller also testified and stated in his report that that he faulted the Village's lack of foresight 50 years ago regarding adverse weather patterns and floods happening more frequently.

{¶23} Hubbard, as the nonmoving party had the burden to "'set forth specific facts showing that there is a genuine issue for trial'" in response to the Village's motion for summary judgment. *Dresher,* 75 Ohio St.3d at 293, quoting Civ.R. 56(E). However, he did meet that burden here. Based on the testimony and evidence attached to his response to the Village's motion for summary judgment, outlined above, Hubbard's allegations of negligence regarding the erosion and

damage to the Hubbard Property arose from two events: (1) the Village's design and construction of the stormwater drainage system at the time of the original construction of the subdivisions 50 years ago; and (2) the 2003 raising of the stream bed and installation of the concrete wall/pad to reduce the volume of water. Mueller answered in the affirmative when asked if his solution was "the design and construction of expanding the culvert[.]" Mueller's opinion was that the remedy was to implement EA's first recommendation of armoring the banks with a rock channel three feet high and 100 feet long which necessarily involves new construction along the stream. Thus, Mueller's solution "'would require [the Village] to, in essence, redesign or reconstruct the sewer system'" which is a governmental function under R.C. 2744.01(C)(2)(l). *Coleman,* 2012-Ohio-3881, at ¶ 30, quoting *Essman,* 2010-Ohio-4837, at ¶ 32-33 (4th Dist.) and *Guenther,* 2012-Ohio-203, at ¶ 18 (2d Dist.). He also criticized the Village's failure to direct the stormwater discharge into a retention pond 50 years ago which is also a design and construction issue.

{¶24} Moreover, neither Mueller nor Hubbard had any knowledge about whether the system showed any signs of disrepair or crumbling, nor did they criticize a deteriorating infrastructure that was not performing as expected or allege that the Village has not kept up with ongoing repairs. Thus, Hubbard presented no material facts at all that his complaint pertains to the proprietary function of the "repair" or "general repair of deterioration" of the system. *Id*.

{¶25} Additionally, Hubbard's allegations challenge major decisions made by the Village regarding the original engineering of the subdivisions and the alterations in 2003 to raise the stream bed and extend the rock channel per the EA's recommendations. Those decisions did not involve "'little discretion [that] would be a matter of routine maintenance'" which could be "'characterized as a maintenance, operation, or upkeep issue'" associated with proprietary functions. *Id.*, quoting *Essman* at ¶ 32. Instead, those decisions involved the allocation of funds and resources toward the

initial design of the existing system and in later upgrades and redesign of the stream to accommodate the increase in stormwater discharge from the construction of additional homes. This Court has previously concluded that decisions made under those circumstances constitute a governmental function:

> . . . *the decision to upgrade an existing sewer system involves the exercise of a governmental function. Duvall v. Akron*[, 1991 WL 231433, \*2-3 (9th Dist. Nov. 6, 1991).] In that case, the plaintiff alleged that a sewer system installed fifty-one years earlier had become "inadequate to meet the current residential demands and that pumps or a general update of the system [were] indicated." *Id*., at \*3. This Court connected the decision to upgrade a sewer system with the initial provision and construction thereof, noting that *"Akron was immune from liability when it exercised its judgment fifty-one years ago and planned sewer construction [. . .] [and] remains immune from liability when it exercises its judgment in determining [. . .] how to allocate its limited financial resources, with regard to updating the sewer system." Id*. See, also, *Zimmerman v. County of Summit, Ohio*[, 1997 WL 22588, \*3 (9th Dist. Jan. 15, 1997)] (concluding that when a sewer system as designed is presently insufficient, requiring "extensive redesigning and reconstructing of the system to meet current demands," a political subdivision's decisions in the matter do not involve proprietary functions.)

(Emphasis added.) *Bauer v. Brunswick*, 2011-Ohio-4877, ¶ 6 (9th Dist.).

{¶26} Based on the foregoing, when viewed in a light most favorable to Hubbard, the nonmoving party, the evidence shows that there is no dispute of material fact that the exception to immunity set forth in R.C. 2744(B)(2) does not apply and that the Village is entitled to political subdivision immunity on Hubbard's negligence claim. Therefore, the court erred in denying the Village's motion for summary judgment on that claim.

{¶27} Accordingly, the Village's first assignment of error has merit and is sustained.

**ASSIGNMENT OF ERROR NO. 2:**

**THE TRIAL COURT ERRED AS A MATTER OF LAW IN DETERMINING THAT THERE ARE GENUINE ISSUES OF MATERIAL FACT AS TO WHETHER [HUBBARD'S] CLAIMS ARE BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS.**

**ASSIGNMENT OF ERROR NO. 3:**

**THE TRIAL COURT ERRED AS A MATTER OF LAW IN DETERMINING THAT THERE ARE QUESTIONS OF FACT TO DEFEAT SUMMARY JUDGMENT AS TO [HUBBARD'S] TAKING CLAIM.**

{¶28} As noted above, by statute (R.C. 2744.02(C)), the order denying the Village's motion for summary judgment based on immunity was immediately appealable. However, the Ohio Supreme Court decided that orders arising along with the political subdivision's immunity claim, such as those predicated on the statute of limitations defense that do *not* deny the benefit of immunity, are not final appealable orders. *Riscatti*, 2013-Ohio-4530, at ¶ 19. Accordingly, while the claims raised in the second and third assignments of error are connected to the Village's immunity claim, only the immunity issue is properly before us. *Id.* at ¶ 20. To the extent that the Village raised other issues in the second and third assignments of error, those are not properly before us in this appeal.

III.

{¶29} Based on the foregoing, the Village's first assignment of error is sustained. The issues raised in the Village's second and third assignments of error are not properly before us. Therefore, the judgment of the Wayne County Common Pleas Court is reversed on the issue of Hubbard's negligence claim, and remanded on the remaining issues.

> Judgment reversed in part, and
> remanded in part.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.


SCOT STEVENSON
FOR THE COURT


HENSAL, P. J.
SUTTON, J.
CONCUR.


APPEARANCES:

TONYA J. ROGERS and KENDRA L. BARABASCH, Attorneys at Law, for Appellant.

GAGE RIGHTER, Attorney at Law, for Appellee.